769 F.2d 1451
 23 ERC 1166
 Bill M. SILKWOOD, Administrator of the Estate of Karen G.
Silkwood, Deceased, Plaintiff-Appellee,
v.
KERR-McGEE CORPORATION, a Delaware corporation, and
Kerr-McGee Nuclear Corporation, a Delaware
corporation, Defendants-Appellants.
 No. 79-1894.
 United States Court of Appeals,
Tenth Circuit.
 July 31, 1985.
 
 William G. Paul, L.E. Stringer, John J. Griffin, Jr. and Harvey D. Ellis, Jr., of Crowe & Dunlevy, Oklahoma City, Okl., C. Lee Cook, Jr., William Van Hagey, and William T. McGrath of Chadwell & Kayser, Chicago, Ill.; and Elliott C. Fenton and Larry D. Ottaway of Fenton, Fenton, Smith, Reneau & Moon, Oklahoma City, Okl., for defendants-appellants on remand.
 James A. Ikard, Oklahoma City, Okl., Arthur R. Angel, Oklahoma City, Okl., Daniel P. Sheehan, Washington, D.C., and G.L. Spence, Jackson Hole, Wyo., for plaintiff-appellee on remand.
 Before McKAY, DOYLE and LOGAN, Circuit Judges.
 McKAY, Circuit Judge.
 
 
 1
 This case is before our court on remand from the Supreme Court of the United States. Defendants Kerr-McGee Corporation and Kerr-McGee Nuclear Corporation (hereinafter collectively referred to as Kerr-McGee) appeal from judgments awarded against them in a suit brought by plaintiff Bill M. Silkwood as administrator of the estate of Karen Silkwood, deceased. The action, a diversity suit tried before a jury, was based upon common-law tort principles[1] under Oklahoma law. Plaintiff sought recovery for personal injury (primarily fear and anxiety) and property damage suffered by Ms. Silkwood as a result of plutonium contamination. The contamination occurred November 5, 6, and 7, 1974. Ms. Silkwood's death in an unrelated automobile accident on November 13, 1974 marked the end of any damages she did suffer and precluded any damages she might have suffered had she lived beyond that date. The jury awarded $500,000 on plaintiff's personal injury claim and $5,000 on his property claim. It also awarded $10,000,000 in punitive damages.[2]
 
 
 2
 In our initial opinion[3] we reversed the personal injury judgment, holding that recovery for those injuries was controlled exclusively by the Oklahoma Workers' Compensation Act, Okla.Stat.Ann. tit. 85 (West 1971 & Supp.1980). We affirmed the property damage judgment, holding that the Oklahoma Act applied only to personal injuries. Finally, we reversed the punitive damages judgment, holding that the award of such damages constituted state action that competed substantially with the federal statutory regulation of the Kerr-McGee plant.
 
 
 3
 Neither our affirmance of the property damages judgment nor our reversal of the personal injury judgment was appealed. Plaintiff did, however, appeal our reversal of the punitive damages judgment. Our decision in that regard was reversed by the Supreme Court, which concluded that the award of punitive damages in this case is not preempted by federal law.[4] The Court remanded, with instructions that Kerr-McGee be free to assert any claims they made before our court that had yet to be addressed. Kerr-McGee now argues that they are entitled to judgment on the punitive damages claim because: (1) there is no evidence that malicious or wanton conduct on their part resulted in the plutonium contamination of Ms. Silkwood's apartment; and (2) they substantially complied with the federal regulatory scheme governing their conduct.
 
 
 4
 Kerr-McGee further contends that if they are not entitled to judgment on the record, the case should be remanded for a new trial on the punitive damages claim for the following reasons: (1) the evidence and the instructions relating to the personal injury claim thoroughly and prejudicially tainted the trial proceedings because any award of punitive damages must be based solely on evidence supporting the claim for property damage; (2) the trial court's jury instructions were fatally defective because the jury was not properly instructed on the effect of compliance with federal regulations; (3) the punitive damages award is outrageously excessive, bearing no relationship to the nature and extent of the injury or to the cause thereof; and (4) the prejudicial publicity surrounding the trial, the misconduct of plaintiff's counsel, and the prejudicial rulings of the trial court combined to deny a fair trial to Kerr-McGee.
 
 
 5
 Karen Silkwood was a laboratory analyst at an Oklahoma Kerr-McGee plant that fabricated fuel pins, containing plutonium, that were used for reactor fuel.[5] Ms. Silkwood worked the afternoon of November 5, 1974. Over the course of that afternoon, she monitored herself for plutonium contamination five times. The first four times she detected no contamination. The fifth time, after withdrawing her hands from one of the glove boxes[6] in which she had been polishing and cleaning plutonium, she found contamination. Further checks were made in the laboratory and other contaminations were found, particularly inside the gloves in the glove box in which Ms. Silkwood had been working. Ms. Silkwood was decontaminated, placed on a five-day voiding collection program, and furnished urine and fecal kits to take home for the purpose of obtaining samples that would be sent to the United States testing laboratory for analysis.
 
 
 6
 On the morning of the next day, November 6, 1974, Ms. Silkwood arrived at work and did some paperwork for one hour. Upon leaving, she tested herself and again found herself to be contaminated. She was decontaminated and, at her request, her locker and auto were tested and found to be free of contamination.
 
 
 7
 The next day, November 7, 1974, Ms. Silkwood went directly to the plant's health physics office upon reporting to work. She was again found to be contaminated. The parties stipulated that the urine samples brought to the plant had been spiked with plutonium; that is, they contained insoluble--not naturally excreted--plutonium. Ms. Silkwood's apartment was also found to have been contaminated. Ms. Silkwood's roommate, who had returned to the apartment from the plant sometime after 8:00 a.m. on November 7th, was contaminated as well. When she had left work, she had been found not to be contaminated. Ms. Silkwood's boyfriend, who spent the night of November 6th in her apartment and left at 7:00 a.m. on the 7th, was not contaminated.
 
 
 8
 Ms. Silkwood's possessions were destroyed and she was sent to the Los Alamos Scientific Laboratory in New Mexico to undergo further tests concerning her contamination. On November 13th, after having reported back to work and being reassigned, she was killed in an automobile accident. A subsequent autopsy revealed that the amount of plutonium within her body at the time of her death was between 25 percent and 50 percent of the permissible lifetime body burden allowed by the Atomic Energy Commission[7] for plutonium workers.
 
 
 9
 We first address Kerr-McGee's contention that they are entitled to a judgment notwithstanding the verdict on plaintiff's punitive damages claim because there is no evidence that the contamination of Ms. Silkwood's apartment was caused by any malicious or wanton conduct on their part.
 
 
 10
 This circuit has previously held that the question of the sufficiency of the evidence needed to go to the jury in a diversity case is a matter of federal law. Oldenburg v. Clark, 489 F.2d 839, 841 (10th Cir.1974).
 
 
 11
 We have previously explicated the federal standard as follows:
 
 
 12
 It is proper for a court to withdraw a case from the jury and direct a verdict only in limited circumstances. A directed verdict is proper only where the evidence and all the inferences to be drawn therefrom are so patent that minds of reasonable men could not differ as to the conclusions to be drawn therefrom.
 
 
 13
 Taylor v. National Trailer Convoy, Inc., 433 F.2d 569, 571-72 (10th Cir.1970).[8]
 
 
 14
 The Oklahoma punitive damages statute, 23 O.S.1981, section 9, provides that:
 
 
 15
 [i]n any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud or malice, actual or presumed, the jury, in addition to the actual damages, may give damages for the sake of example, and by way of punishing the defendant.
 
 
 16
 The requisite malice may be inferred from gross negligence that indicates a conscious indifference to the consequences of one's acts, Wootan v. Shaw, 205 Okl. 283, 237 P.2d 442 (1951), or a reckless disregard for the safety of others. Thiry v. Armstrong World Industries, 661 P.2d 515, 517 (Okla.1983).
 
 
 17
 In support of his punitive damages claim, plaintiff presented evidence relating to plant security, worker training, management, radiation detection, medical evaluation, and contamination incidents. Dr. Karl Morgan, who for 29 years directed the government's health physics program at Oak Ridge, Tennessee, described defendant's operations as one of the worst, from the standpoint of safety, that he had ever reviewed. He testified that he "could not imagine such a lackadaisical attitude could be developed in an organization in reference to the health and safety of the people," and concluded that defendants' practices reflected a "callous" and "wanton" disregard for the health and safety of employees.
 
 
 18
 In addition to this and other expert testimony, plaintiff introduced substantial testimony of individuals who worked at defendants' plant that related to defendants' disregard for employee safety and to their endangerment of the public.
 
 
 19
 Plaintiff offered considerable documentary and statistical evidence on this issue as well, the most notable of which was evidence indicating that during the period from 1972-1976 Kerr-McGee was unable to account for as much as 10.4 kilograms of plutonium.
 
 
 20
 Defendants, of course, presented substantial evidence in rebuttal of plaintiff's claim of gross negligence. We need not recite that evidence here, however. In determining whether a judgment notwithstanding the verdict should be entered, whether it be under the Oklahoma standard or the federal standard, our function as an appellate court is not to determine where the preponderance of the evidence lies. Rather, we are confined to the assessment of whether plaintiff has presented evidence sufficient that a reasonable person might conclude that gross negligence on the part of Kerr-McGee caused damage to Ms. Silkwood's property.
 
 
 21
 It is true, as defendants contend, that plaintiff offered no direct evidence that the general pattern of gross negligence it sought to establish by the above evidence was the specific cause of the escape of plutonium in this particular instance. However, a jury may permissibly infer from a pattern of negligence likely to cause a particular kind of injury that such negligence did indeed cause the injury. See Averitt v. Southland Motor Inn of Oklahoma, 720 F.2d 1178, 1181-82 (10th Cir.1983). Plaintiff presented sufficient evidence of gross negligence and of causation to preclude a judgment notwithstanding the verdict for Kerr-McGee on the ground of insufficiency of the evidence.
 
 
 22
 Kerr-McGee further argues for a judgment notwithstanding the verdict on the theory that its substantial compliance with the federal regulatory scheme governing its conduct precluded the award of punitive damages. Kerr-McGee's argument in this regard appears to be two-pronged, although it is not clearly explicated as such. First, Kerr-McGee contends that substantial compliance with the federal regulatory scheme precludes the award of punitive damages as a matter of federal preemption. Second, Kerr-McGee apparently argues that even if this is not the case, such compliance is a bar to punitives as a matter of Oklahoma state law.
 
 
 23
 In reversing our decision striking down the district court's punitive damages judgment, the Supreme Court held that the existence of a federal scheme regulating Kerr-McGee did not preempt the award of punitive damages under state tort law principles.
 
 
 24
 No doubt there is tension between the conclusion that safety regulation is the exclusive concern of the federal law and the conclusion that a state may nevertheless award damages based on its own law of liability. But as we understand what was done over the years in the legislation concerning nuclear energy, Congress intended to stand by both concepts and to tolerate whatever tension there was between them. We can do no less. It may be that the award of damages based on the state law of negligence or strict liability is regulatory in the sense that a nuclear plant will be threatened with damages liability if it does not conform to state standards, but that regulatory consequence was something Congress was quite willing to accept.
 
 
 25
 104 S.Ct. at 625-26.
 
 
 26
 Kerr-McGee argues, in effect, that while the existence of the federal regulatory scheme does not preclude the award of punitive damages, full compliance with that scheme does. While it is true that the Supreme Court did not explicitly find that, as a matter of federal preemption, punitive damages may be awarded even if Kerr-McGee substantially complied with the federal regulatory scheme, for us to find that they may not would be inconsistent with the principles implicit in the Court's opinion. The Court stated that:
 
 
 27
 insofar as damages for radiation injuries are concerned, preemption should not be judged on the basis that the federal government has so completely occupied the field of safety that state remedies are foreclosed but on whether there is an irreconcilable conflict between the federal and state standards or whether the imposition of a state standard in a damage action would frustrate the objectives of the federal law. We perceive no such conflict in the circumstances of this case.
 
 
 28
 104 S.Ct. at 626.
 
 
 29
 The Supreme Court was well aware of the "circumstances of this case" regarding the substantial compliance issue. The Court noted that Kerr-McGee offered evidence that it had complied with most federal regulations. 104 S.Ct. at 619. The Court made specific note of a Nuclear Regulatory Commission official's testimony that there were no serious personnel exposures at the plant and that Kerr-McGee did not exceed the regulatory requirements with respect to exposure levels that would result in significant health hazards. Id. The Court also noted the Nuclear Regulatory Commission's report on the investigation of the incident involving Ms. Silkwood, in which the Commission determined that Kerr-McGee's only violation of federal regulations throughout the incident was its failure to maintain a record of the dates of two urine samples submitted by Ms. Silkwood. Id. Moreover, both of the dissents treated the majority opinion as holding that compliance with federal regulations does not preclude the award of punitive damages under state law principles of tort.[9] Kerr-McGee asks us, in effect, to read the Supreme Court's opinion as holding that the existence of the federal regulatory scheme does not preclude the award of punitive damages--unless that scheme is substantially complied with. In other words, the state may impose, in addition to the federal standard, its own stricter safety standard on a nuclear plant--unless the plant complies with the less stringent federal standard. We do not believe that this non sequitur can be reasonably inferred from the Supreme Court's opinion.
 
 
 30
 While the Supreme Court has determined that Oklahoma is not precluded from allowing the award of punitive damages despite substantial compliance with a federal regulatory scheme, the question remains whether Oklahoma does indeed allow punitive damages in such circumstances. The district court opinion never clearly addresses this question. The court concluded, after reviewing relevant federal and state cases from jurisdictions other than Oklahoma, that under traditional principles of tort law, compliance with government safety regulations does not bar the award of punitive damages. The court did not, however, explicitly inquire as to whether and how past decisions of the Oklahoma Supreme Court inform the issue. Inquiry into what the general law of tort is in this regard becomes relevant only after a determination that the question has not been decided, either directly or indirectly, by the Oklahoma Supreme Court.
 
 
 31
 Our own analysis of Oklahoma law convinces us, however, that the district court's conclusion was correct. Although the Oklahoma Supreme Court has yet to address the question of whether substantial compliance with a regulatory scheme bars the award of punitive damages, that court has embraced the general proposition that "mere compliance with statutory requirements does not relieve a party from responsibility for negligence as a matter of law." Transport Indemnity Company v. Page, 406 P.2d 980, 985 (Okla.1965); see also Roadway Express, Inc. v. Baty, 189 Okl. 180, 114 P.2d 935, 937 (1941) ("merely complying with the statutory requirement relating to the position of his car on the paving did not, as a matter of law, save plaintiff from negligence"). We conclude that, if faced with the specific question, the Oklahoma Supreme Court would find, for the reasons enunciated by the district court, that under Oklahoma law substantial compliance with a regulatory scheme does not bar the award of punitive damages. We therefore reject Kerr-McGee's argument that substantial compliance with federal nuclear regulations rendered it immune to tort liability, including the possibility of punitive damages. We must nevertheless remand for a new trial for the reasons we will now set forth.
 
 
 32
 Kerr-McGee contends that a new trial should be ordered because evidence of Ms. Silkwood's personal injury was introduced in the trial below, and the Oklahoma Worker's Compensation Act, Okla.Stat.Ann. tit. 85 (West 1971 & Supp.1980), functions as a bar to any evidence relating to a covered personal injury. The Oklahoma Act provides that an employer shall pay compensation "for the disability or death of his employee resulting from an accidental personal injury sustained by the employee arising out of and in the course of his employment...." Id. at 8, 11. Section 12 of the Act provides that the liability prescribed in section 11 "shall be exclusive and in place of all other liability of the employer ..., at common law or otherwise, for such injury...."
 
 
 33
 Defendants argue that the Act functions as a complete bar to evidence relating to a covered personal injury claim. Plaintiff contends that while a covered personal injury may not be compensated by an award for actual damages, it may nevertheless be the basis of an award of punitive damages. Oklahoma has yet to decide the question of whether the Act functions as a complete evidentiary bar, or whether it merely precludes the award of actual damages. Our review of the Act and of Oklahoma case law convinces us, however, that the Oklahoma Supreme Court would reject both of the extreme positions advanced by the parties in favor of a more moderate view.
 
 
 34
 If, as defendants contend, the Oklahoma Act functions as a complete evidentiary bar, it would work a substantial hardship on potential plaintiffs whose rights were not intended to be affected by the Act. For example, an evidentiary bar would preclude a non-employee who was injured by a defendant employer's negligent act from introducing evidence of past similar injuries to employees, which would be otherwise admissible under Oklahoma law in order to demonstrate the knowledge and malice of the defendant for purposes of a punitive damages determination. See Kurn v. Radencic, 193 Okl. 126, 141 P.2d 580 (1943); Averitt v. Southland Motor Inn of Oklahoma, 720 F.2d 1178 (10th Cir.1983); Edgar v. Fred Jones Ford, 524 F.2d 162 (10th Cir.1975). Similarly, an evidentiary bar would work a substantial hardship on employees, like Ms. Silkwood, who press a property claim against an employer, even though such a claim is clearly not within the scope of the Act. There is no indication, either in the language of the Act or in the legislative history, that it was intended to limit the ability of plaintiffs to introduce evidence of covered injuries in order to prove elements of claims not covered by the Act through functioning as a complete evidentiary bar.
 
 
 35
 Evidence of an injury covered by the Act, however, may not be the basis for damages of any kind--actual or punitive. The Act is exclusive of "all other liability of the employer." (emphasis added). See 2A Larson, The Law of Workmen's Compensation, Sec. 65.37 (1983) (reciting and documenting the well-recognized principle that punitive damages claims are barred by the exclusivity provisions, such as Oklahoma's, in workers' compensation acts). Cf., Arrington v. Michigan-Wisconsin Pipe-Line Co., 632 F.2d 867 (10th Cir.1980) (Oklahoma's workers' compensation remedy is exclusive even where plaintiff alleges the "highest possible degree of negligence"). Therefore, evidence of an injury covered by the Act that is admissible to prove an element of a claim for a non-covered injury must be properly restricted to that purpose by a limiting instruction. We are aware that in allowing evidence of a covered injury to prove an element of a non-covered claim we leave open the possibility that a covered injury may indirectly give rise to employer liability for that non-covered claim where none would have existed otherwise. However, our position is mandated by the fact that a complete evidentiary bar would expand the reach of the Oklahoma Act well beyond its framers' intent.
 
 
 36
 Plaintiff offers two cases in support of his position that even though an injury is non-compensable by actual damages because of workers' compensation exclusivity, that injury may nevertheless be the basis of a punitive damages award. In the first, Martin v. Texaco, Inc., 726 F.2d 207 (5th Cir.1984), the widow of a Texas worker who was killed on the job brought a diversity suit seeking punitive damages in Texas federal court. The district court allowed the jury to consider evidence of injury and to determine how much actual damages it would award, even though such damages were, in fact, unrecoverable because they were subject to the exclusive remedy of the workers' compensation system. The jury returned a verdict for $450,000 in actual damages and $1 million in punitive damages, upon which the trial court entered judgment for plaintiff of $0 actuals and $1 million punitives. The Fifth Circuit affirmed. Martin is distinguishable from the case at hand in an obvious and significant way. The claim involved in that case--punitive damages for gross negligence causing death--was specifically preserved both by the Texas constitution[10] and by the Texas Workers' Compensation Act.[11] The Oklahoma Workers' Compensation Act not only contains no such specific preservation, but affirmatively precludes imposition of any other liability for a covered injury.
 
 
 37
 Another case plaintiff cites in support of the proposition that Ms. Silkwood's personal injury may be the basis of a punitive damages award is Nales v. State Farm Mut. Ins. Co., 398 So.2d 455 (Fla.App.1981). That case involved the Florida no-fault automobile law, which places a statutory limitation on an injured party's common-law right to claim damages for pain, suffering, mental anguish and inconvenience.[12] To avoid this limitation a party must prove that he or she has suffered permanent injury. The plaintiff, who had been injured by a drunk driver, sought both actual and punitive damages. The trial court instructed the jury that the plaintiff had to prove permanent injuries to recover both those types of actual damages expressly limited by the statute and punitive damages. The jury returned a verdict for the defendant. The court of appeals reversed the trial court, holding that even though certain types of actual damages arising from a non-permanent injury were not compensable under the Florida no-fault insurance law, that law did not preclude a common-law claim for punitive damages for such an injury. This case, too, misses the mark. Unlike the Oklahoma Workers' Compensation Act, the Florida no-fault insurance law does not purport to be exclusive of all other liability.
 
 
 38
 Both Martin and Nales stand for the proposition that where a statute precludes actual damages for a particular kind of injury but does not explicitly preclude other forms of liability, that injury may be the basis for a punitive damages award. The Oklahoma Workers' Compensation Act explicitly provides, however, that the liability it prescribes "shall be exclusive and in place of all other liability of the employer...." (emphasis added). Thus, Martin and Nales have no application to this case.
 
 
 39
 Having found that a personal injury covered by the Act may not be the basis of a punitive damages award, we must next address the question of whether Ms. Silkwood's personal injury was, in fact, the basis of any portion of the punitive damages awarded below. Plaintiff argues that the nature of punitive damages is such that the award would have been the same even if the trial below had been properly restricted to the property damage claim. This is so, plaintiff contends, because punitive damages analysis focuses not so much on the nature and extent of a plaintiff's injury as upon the endangerment to society created by the negligent conduct of the defendant and the punishment necessary to deter such conduct in the future. Plaintiff notes that our ruling on workers' compensation did not diminish Kerr-McGee's size and wealth, nor did it diminish the risk created by the escape of plutonium. In further support of his position, plaintiff offers Oklahoma cases holding that a punitive damages award need bear no relation to the actual damages awarded.
 
 
 40
 It is indeed true that under Oklahoma law the wealth of the defendant and the risk created by the defendant's negligent conduct are substantial factors to be considered in the calculation of punitive damages. See Whiteley v. OKC Corp., 719 F.2d 1051 (10th Cir.1983); Smith v. U.S. Gypsum Co., 612 P.2d 251 (Okla.1980); Thiry v. Armstrong World Industries, 661 P.2d 515 (Okla.1983). It is also true that under Oklahoma law punitive damages need bear no relation to the actual damages awarded. Garland Coal and Mining Co. v. Few, 267 F.2d 785, 791 (10th Cir.1959); Cates v. Darland, 537 P.2d 336, 340 (Okla.1975). Indeed, under Oklahoma law, punitive damages may be recovered even in conjunction with nominal actual damages. Moyer v. Cordell, 204 Okl. 255, 228 P.2d 645 (1951); Beavers v. Lamplighters Realty, Inc., 556 P.2d 1328, 1333 (Okla.App.1976). In several instances the Oklahoma Supreme Court has reduced an actual damages award but refused to reduce the attendant punitive damages award. See, e.g., Hobbs v. Watkins, 481 P.2d 746 (Okla.1971); Moyer v. Cordell, 204 Okl. 255, 228 P.2d 645 (1951). Thus, if Ms. Silkwood's personal injury were a permissible basis for a punitive damages claim, our striking down plaintiff's actual damages award would not necessarily require a reduction in the amount of the punitive damages award. The Oklahoma Workers' Compensation Act precludes all liability for a covered injury, however. Accordingly, our inquiry must be whether Ms. Silkwood's personal injury was indeed the basis for a portion of the punitive damages award. We must conclude that it was.
 
 
 41
 While under Oklahoma law punitive damages need bear no relation to the amount of actual damages awarded, they must bear some relation to the "cause and extent of one's injuries." Hobbs v. Watkins, 481 P.2d 746, 747-48 (Okla.1971). See also Cates v. Darland, 537 P.2d 336, 340 (Okla.1975); Sopkin v. Premier Pontiac, Inc., 539 P.2d 1393, 1398 (Okla.App.1975); Garland Coal and Mining Co. v. Few., 267 F.2d 785, 791 (10th Cir.1959). The Oklahoma Supreme Court recently noted in Timmons v. Royal Globe Insurance Co., 653 P.2d 907, 918 (Okla.1982), that the harm caused to society by the particular conduct establishing liability for punitive damages, as well as the societal harm caused by that genre of conduct, were considerations material to a punitive damages award. The court also looked to the wealth of the defendant and to the deterrent effect of the award, but did not purport to overrule prior cases by enunciating an exclusive list of material factors. Thus, under Oklahoma law, although such factors as risk created and deterrent effect may be considered in determining a punitive damages award and the amount of punitive damages need bear no relation to the amount of actual damages awarded, the analysis is not open-ended. Rather, it must be disciplined by reference to injuries actually caused by the defendant, both to the plaintiff and to society generally.
 
 
 42
 On the issue of punitive damages the trial court instructed the jury as follows:
 
 
 43
 Any exemplary damages that you award must bear some relationship to the injuries inflicted, but need not bear any relation to the amount of actual damages.
 
 
 44
 485 F.Supp. at 603. Thus, by instructing the jury to consider "the injuries inflicted" without restricting their consideration to the property damage claim, the district court explicitly invited the jury to increase the size of the punitive damages award on the basis of Ms. Silkwood's personal injury. As we have held, although evidence of an injury covered by the Oklahoma Workers' Compensation Act is admissible to prove an element of a claim not covered by the Act, it must be limited to that purpose. It may not be used by the jury as the basis for increased punitive damages in the jury's assessment of the appropriate relation between the injuries inflicted and the punitive damages award. Consequently, the trial court erred in using an instruction that invited the jury to consider a factor in setting the size of the punitive damages award that Oklahoma law forbids.
 
 
 45
 Any jury award of punitive damages involves a "discretionary moral judgment," see Smith v. Wade, 461 U.S. 30, 52, 103 S.Ct. 1625, 1638, 75 L.Ed.2d 632 (1983). Oklahoma law places very little limitation on the jury's discretion in making this moral judgment. Thus, no clear guidelines exist for us to determine what is an appropriate amount for a punitive damages award. In such a situation we are reluctant to hold errors that permitted the jury to consider improper elements in fashioning its award to be harmless. Because we cannot determine to what extent the jury's punitive damages analysis was distorted by the consideration of an impermissibly large actual injury, a new trial is required.
 
 
 46
 In addition to limiting the use of Ms. Silkwood's personal injury so as not to increase the size of the punitive damages award, the district court on retrial must ensure that the entire focus is on the type of conduct by Kerr-McGee that could have caused Ms. Silkwood's property damage: conduct allowing plutonium to escape the Kerr-McGee plant. Only evidence that relates to the plant operations and practices relevant to that escape will be admissible. Evidence of Ms. Silkwood's personal exposure will be admissible only insofar as it bears on that issue. Thus, no doubt some of the evidence that the jury may have considered in making the punitive damages award in the earlier trial will not be admissible in the new trial. Further, the evidence of Ms. Silkwood's personal injury that is admissible for proving the property damage claim must be restricted so as not to be a factor in the determination of the required relation between injuries inflicted and the amount of punitive damages. Because a new trial is required to determine whether Kerr-McGee's conduct that caused plaintiff's property damage warrants imposition of punitive damages and, if so, the amount of those damages, we need not consider Kerr-McGee's other grounds for a new trial.
 
 
 47
 Finally, we address plaintiff's claim that he is entitled to a new trial on his personal injury claim. We, of course, previously reversed the district court's judgment for the plaintiff on this claim, holding that workers' compensation was the exclusive remedy for Ms. Silkwood's personal injuries. Plaintiff contends, however, that the trial court's rulings regarding the workers' compensation law framed the case in such a way that plaintiff's counsel "contented themselves" with offering intentional tort evidence solely to rebut Kerr-McGee's theory of self-contamination, and did not "marshal the evidence" or "frame arguments" in such a way as to persuade the jury that an intentional tort had been committed. We find the argument that plaintiff's counsel were induced to complacency on this issue somewhat less than persuasive. Plaintiff had opportunity as well as incentive to marshal and persuasively present all the evidence available to prove that Kerr-McGee intentionally contaminated Ms. Silkwood. Demonstrating intent on the part of Kerr-McGee to contaminate Ms. Silkwood was of obvious significance to plaintiff's punitive damages claim.
 
 
 48
 Moreover, even if plaintiff's effort to prove intent was less fervent than it might have been if the trial court had properly ruled on the workers' compensation law, under the doctrine of "law of the case" plaintiff is not entitled to a new trial on this claim.[13] Under this doctrine plaintiff would be required to show that our previous decision was "clearly erroneous" or that it would result in a "manifest injustice." Handi Inv. Co. v. Mobil Oil Co., 653 F.2d 391, 392 (9th Cir.1981); White v. Murtha, 377 F.2d 428, 431-32 (5th Cir.1967). In view of plaintiff's obvious incentive at the trial below to prove intentional contamination, we would be hard-pressed to hold that plaintiff has met this standard. Put simply, plaintiff has had his day in court on his compensatory damages claim. He is not entitled to another.
 
 
 49
 The punitive damages judgment is reversed, and the cause is remanded for a new trial on the punitive damages issue.
 
 
 50
 DOYLE, Circuit Judge, dissenting.
 
 
 51
 I respectfully dissent.
 
 
 52
 Notwithstanding that the plaintiff has prevailed in his several appearances against Kerr-McGee and Kerr-McGee Nuclear Corporation, Judges McKay and Logan, who are part of a three-judge panel, continue the same arguments. This writer is and continues to be on the short side or end.
 
 
 53
 I submit that the points on which the majority have sought to gain a dominant position are surprisingly lacking in either logic or contribution to either social values or moral quality.
 
 
 54
 The first trial continued for eleven weeks. It received a most careful treatment. To try this case once again is atrocious.
 
 PRELIMINARY STATEMENT
 
 55
 This case is before us on remand from the Supreme Court of the United States. Defendant Kerr-McGee Corporation, and its subsidiary, Kerr-McGee Nuclear Corporation, appeal from judgments against them that were entered in a suit filed by Bill M. Silkwood, as Administrator of the Estate of Karen Silkwood. The suit was a diversity action based on Oklahoma common-law tort principles. It was tried to a jury in the United States District Court for the Western District of Oklahoma in 1979. Plaintiff Silkwood, the father of Karen Silkwood, sought recovery for personal injuries and property damage suffered by Karen Silkwood resulting from plutonium contamination incidents which occurred on November 5, 6 and 7, 1974. The trial was successful. The jury awarded the plaintiff $500,000 actual damages for plaintiff's personal injury claim and $5,000 in actual damages for the property damage claim. It also awarded $10,000,0000 in punitive damages. Silkwood v. Kerr-McGee Corp., 485 F.Supp. 566 (W.D.Okla.1979).
 
 
 56
 In this court's first opinion in this case, 667 F.2d 908 (10th Cir.1981), the majority of the panel reversed the personal injury judgment and ruled that the Oklahoma Workers' Compensation Act barred a common-law recovery for Ms. Silkwood's personal injuries. The property damage award was affirmed. Finally, a majority of the panel reversed the punitive damage award, holding that the award of punitive damages under state law was preempted by federal regulation of the nuclear industry.
 
 
 57
 Plaintiff Silkwood appealed this court's reversal of the punitive damage award. The Supreme Court's conclusion was that a punitive damage award in this case was not preempted by federal regulation. Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984). It remanded the cause to this court with the ruling that punitive damages were not preempted and were subject to state laws, and with instructions that Kerr-McGee was free to assert any claims it had made before us that we did not address in our first opinion. 104 S.Ct. at 626-27.
 
 
 58
 Kerr-McGee now asserts that it is entitled to a judgment notwithstanding the verdict on the punitive damages claim. They persist in their contention that there was a dearth of evidence that the contamination of Ms. Silkwood's apartment resulted from malicious conduct on its part that would justify a punitive award. If they were not responsible, who was? It also requests judgment notwithstanding the verdict on the grounds that its "substantial compliance" with federal regulations bars a punitive damages award. In the alternative, Kerr-McGee advances four further arguments in its effort to obtain a new trial on the punitive damages issue. First, it argues that the jury's punitive award was "tainted" by the introduction of evidence concerning Silkwood's physical injuries at trial. Second, it asserts that the punitive award entered is disproportionate to the actual damages as a matter of law. Third, it suggests that the trial court's jury instructions on the effect of compliance with federal regulations were prejudicially defective. Finally, Kerr-McGee asserts that it was denied a fair trial because of extraneous anti-nuclear publicity at the time of the trial and because of the trial tactics of plaintiff's counsel. It is important to remember that the Kerr-McGee employees were constantly looking over Silkwood's activity not only in the plant but also in her home. Both her apartment and her person were soaked with nuclear material at the time of the auto accident.
 
 THE PERTINENT FACTS
 
 59
 The pertinent evidence surrounding Ms. Silkwood's contamination established that condition. Karen Silkwood was a laboratory analyst at Kerr-McGee's Cimmaron plant located near Crescent, Oklahoma. The plant fabricated fuel pins containing plutonium for use as reactor fuel. Silkwood was contaminated by plutonium on November 5, 6, and 7, 1974. The parties have stipulated that this very plutonium origin came from the Kerr-McGee plant.
 
 
 60
 Plutonium is an artificially produced radioactive chemical element which is the essence for the development of nuclear weapons and nuclear power. It emits alpha particles, beta particles, neutrons, gamma rays and x-rays. Thus there is acknowledgment that plutonium from Kerr-McGee is one of the most carcinogenic and dangerous substances known.
 
 
 61
 As a member of the Oil, Chemical and Atomic Workers Union (OCAW), Silkwood represented some of the workers in this Kerr-McGee plant. As an elected member of the union negotiating team, Silkwood was responsible for health and safety matters. In September 1974 she, together with her fellow committee members, met with OCAW leaders in Washington, D.C. There she presented charges to the Atomic Energy Commission (AEC) as to numerous health and safety violations by Kerr-McGee. The AEC requested documentation of the charges. Ms. Silkwood was assigned the job of collecting this documentation. She was engaged in collecting information and recording it in notebooks and on tapes from September 1974 and continuing until the time of her death.
 
 
 62
 Ms. Silkwood's first contamination occurred on November 5, 1974. She reported to work at the Cimmaron plant on November 5 at 1:20 p.m. At 2:45 p.m. and 3:15 p.m., before and after taking a break, Silkwood monitored herself with plutonium detecting devices provided by Kerr-McGee in accordance with AEC license requirements. No plutonium was detected on her person. At about 3:45 p.m. Silkwood began to work in two glove boxes containing plutonium. A glove box is a supposedly impervious box surrounding the plutonium processing equipment which has glove holes. This allows the operator to work on the equipment or with the plutonium from outside the box. Silkwood monitored herself before and after her break at 5:30 p.m. and at 5:45 p.m. and at those times detected no contamination. She continued to work in the glove boxes, but upon withdrawing her hands from one of the boxes at about 6:30 p.m., she became aware of high contamination. Further checks made in the laboratory revealed other contaminations. These took place inside the gloves in the glove box in which Silkwood had been polishing and cleaning plutonium.
 
 
 63
 A substantial amount of contamination was found on Silkwood's left hand, right wrist, upper arm, neck, face, hair, and her nostrils. Pursuant to regulations, Silkwood was immediately decontaminated and placed on a five-day voiding collection program. She was provided with urine and fecal kits to take home. These were for the purpose of obtaining samples to send to the United States testing laboratory for analysis. Later that day Silkwood returned to work, but not to the glove boxes. She monitored herself when she left work at about 1:10 a.m. and found no contamination. The glove box was later tested by the AEC investigators, and no leaks were found. Further, the investigators found no significant airborne contamination in the laboratory.
 
 
 64
 The next day, November 6, 1974, Silkwood arrived at work at 7:50 a.m., and did some paper work in the lab until 8:50 a.m. She then left to attend a previously scheduled union meeting. At that time she tested herself and found contamination on her right forearm, face, and neck. Her hands were decontaminated. The other spots appeared to be fixed contamination, so she was allowed to attend the union meeting. She returned to the health office at 4:30 p.m. Slight contamination was found on her right forearm, neck and face, and in her nostrils. She was again decontaminated and, at her request, her locker and auto were tested and found to be free of contamination.
 
 
 65
 On November 7, 1974, when she reported to work Silkwood went directly to the plant's health physics office. She was found to be contaminated in her nostrils and on her hands, arms, chest, back, neck and right ear. Four urine and one fecal sample collected on November 5th, 6th and 7th were found to be contaminated, although the exterior of the kits showed no contamination. The parties stipulated that urine samples brought to the plant contained insoluble, not naturally excreted, plutonium. Silkwood's apartment was also found to have been contaminated, with the highest concentrations of plutonium found in the bathroom and on a package of bologna and cheese in the refrigerator.
 
 
 66
 Silkwood's roommate, Sherri Ellis, also a laboratory analyst at Kerr-McGee, was found not to be contaminated when she left work at 8:00 a.m. on November 7th after working a midnight shift. After returning to the apartment, Ellis used the bathroom and retired to her bedroom. Subsequent checks revealed contamination of Ellis' buttocks and hands. But Ellis' auto and the refrigerator where her lunch had been placed in the plant lunchroom were free of contamination.
 
 
 67
 Silkwood seemed to be continuously surrounded by plutonium during the period prior to the accident and death.
 
 
 68
 Silkwood's possessions were destroyed and Silkwood was sent to the Los Alamos Scientific Laboratory in New Mexico to have further tests concerning contamination. On November 13 she reported back to work. At that time she was reassigned. She participated in a union negotiating session that day, met with AEC inspectors concerning her contamination, and attended a union strategy session.
 
 
 69
 That night Silkwood was on her way to meet a New York Times reporter and an OCAW leader when she was killed in an automobile accident. The subsequent autopsy revealed that the amount of plutonium within Silkwood's body at the time of her death was between 25% and 50% of the permissible lifetime body burden allowed by the AEC for plutonium workers.
 
 
 70
 In this court's first opinion, it was concluded that Silkwood's apartment had become contaminated during the preparation of her urine sample on November 7, 1974. The exact way that the plutonium found its way into Ms. Silkwood's apartment has not been determined. Two things are clear: the plutonium did come from Kerr-McGee's plant, which has been stipulated by the parties; and, as the jury found, Karen Silkwood did not intentionally remove the plutonium from the plant.KERR-McGEE'S DEMAND THAT THE PUNITIVE DAMAGES BE DENIED
 
 
 71
 Kerr-McGee makes two arguments for judgment notwithstanding the verdict. Kerr-McGee's contentions are that there was insufficient evidence presented at trial to permit a reasonable jury to conclude that its conduct warranted an award of punitive damages. We maintain that this evidence is ample. That was the source of all of this material and the origin goes back there regardless of the starting line.
 
 
 72
 Oklahoma's punitive damages statute, 23 O.S. 1981 Sec. 9, permits punitive awards in any non-contractual action whenever the defendant has been "guilty of oppression, fraud or malice, actual or presumed." Oklahoma case law permits malice to be presumed whenever the defendant's course of conduct can be said to show a reckless disregard for public safety. Thiry v. Armstrong World Industries, 661 P.2d 515, 518 (Okla.1983). In order to justify submission of the punitive damages issue to the jury, all that the plaintiff had to do was submit sufficient evidence to allow a reasonable person to conclude that Kerr-McGee's conduct displayed a reckless disregard for public safety. There is adequate evidence to establish this. See Taylor v. National Trailer Convoy, Inc., 433 F.2d 569, 571-72 (10th Cir.1970). Upon reviewing the record it is apparent that the plaintiff's evidence was ample to satisfy this burden.
 
 
 73
 Plaintiff Silkwood presented substantial evidence at trial of Kerr-McGee's indifference to employee safety and to the safety of the public at large. One expert witness, Dr. Karl Morgan, served as Director of the government's Oak Ridge, Tennessee, Health Physics Program for 29 years. He testified that Kerr-McGee's Cimmaron operation was one of the worst, in terms of safety, that he had ever evaluated. He characterized the defendant's attitude toward safety as "lackadaisical," and concluded that defendant's conduct reflected a "callous" and "wanton" disregard for employees' safety. Plaintiff also presented substantial statistical evidence concerning Kerr-McGee's handling of plutonium. That evidence indicated that, among other problems, Kerr-McGee was unable to account for as much as 10.4 kilograms of plutonium between 1972 and 1976.
 
 
 74
 Plaintiff's evidence was more than sufficient to permit a reasonable person to find reckless disregard for public safety on Kerr-McGee's part. Moreover, the evidence of a pattern of reckless disregard for public safety was also sufficient to permit a reasonable person to infer that Kerr-McGee's course of conduct caused the damage to Ms. Silkwood's property. See Averitt v. Southland Motor Inn of Oklahoma, 720 F.2d 1178, 1181-82 (10th Cir.1983). Kerr-McGee's argument that there was insufficient evidence to allow the punitive damages issue to be submitted to the jury is properly denied.
 
 
 75
 Kerr-McGee's next argument is that its "substantial compliance" with federal regulations governing the nuclear industry precludes an award of punitive damages, and that therefore this court should enter judgment notwithstanding the verdict in its favor. This argument fails as is shown by the presence of the material itself.
 
 THE RECENT OPINION OF THE SUPREME COURT
 
 76
 The Supreme Court's opinion in this case made it clear that, despite the existence of federal nuclear regulations, Oklahoma and other states were free to award damages under state tort law to parties injured by nuclear activities, 104 S.Ct. at 625. The necessary implications of this holding are that states are free to formulate their own standards of care that will govern conduct of nuclear activities within their borders, and that such standards of care may differ from federal regulatory standards. In asking us to hold that substantial compliance with federal regulatory standards precludes a punitive damage award based upon a differing state standard of care, Kerr-McGee is asking us to circumvent the Supreme Court's decision. This we cannot do. After all there is no magic associated with this compliance.KERR-McGEE'S PLEA FOR A NEW TRIAL
 
 
 77
 We turn now to Kerr-McGee's arguments that it is entitled to a new trial on the punitive damages award. The Supreme Court's decision in this case has expressly allowed the upholding of the jury's punitive damages award as long as it is consistent with Oklahoma law and is supported by the evidence adduced at trial. 104 S.Ct. at 626-27. To evaluate that award, we must consider the Oklahoma law and policies which govern such verdicts.
 
 VALIDlTY OF THE DAMAGES
 
 78
 Oklahoma law mandates that the threat from the defendant's course of conduct to society must be the focus of our inquiry. The Oklahoma Supreme Court has stated that:
 
 
 79
 Unlike ... compensatory damages, which are to benefit the individual plaintiff, punitive damages are imposed to benefit society. The plaintiff acts as a private attorney general to punish the culpable wrongdoer, thereby encouraging adherence to safety standards that benefit [society] generally.... [I]t is not the plaintiff's individual right, but society's as a whole, that is being defended.
 
 
 80
 Thiry v. Armstrong World Industries, 661 P.2d 515, 518 (Okla.1983) (emphasis in original). Although a plaintiff must allege and prove an actual injury that is judicially cognizable in order to recover punitive damages, id., the Oklahoma court has indicated that:
 
 
 81
 Such damages are not compensatory in nature. A party asking for exemplary damages has only an incidental personal interest. His recovery is whole and complete with actual damages. Exemplary damages, as a tool to deter the wrongdoer, is [sic] for society's benefit and not the litigating party's.
 
 
 82
 Slocum v. Phillips Petroleum Co., 678 P.2d 716, 719 (Okla.1983).
 
 
 83
 Because punitive damages are intended to punish a defendant for his past conduct, Oklahoma law requires that they are in proportion to the culpability of that conduct, and to the defendant's wealth, rather than to any actual damages awarded. As the Oklahoma court has said:
 
 
 84
 The punishment function can only be achieved if the defendant is "stung" by the [punitive] award. The penalty should therefore not only match the misconduct but of necessity should relate to the wealth of the wrongdoer.
 
 
 85
 Thiry, 661 P.2d at 518. Although the extent of the plaintiff's injury must necessarily be considered in assessing punitive damages, Oklahoma has often permitted large punitive awards notwithstanding that relatively nominal actual damages were awarded. See, e.g, Timmons v. Royal Globe Insurance Co., 653 P.2d 907 (Okla.1982) ($34,126 actuals; $1,500,000 punitives); Sopkin v. Premier Pontiac, Inc., 539 P.2d 1393 (Okla.App.1975) ($400 actuals, $7,100 punitives); Cates v. Darland, 537 P.2d 336 (Okla.1975) ($200 actuals, $7,000 punitives). See also Jones v. Lennington, 629 P.2d 805, 807 (Okla.App.1981) (dictum) ($1,000,000 punitive award with $1 nominal damages could be permissible under Oklahoma law). Such large awards have been permitted because the jury, having heard the evidence on the culpability of a defendant's conduct, is peculiarly suited to act as the conscience of the community; the jury determines the appropriate size of the award whereby it will adequately punish and deter the defendant. E.g., Jones v. Lennington, 629 P.2d at 807.
 
 
 86
 The authorities in Oklahoma permit punitive damage awards in strict liability cases. Thiry v. Armstrong World Industries, 661 P.2d 515 (Okla.1983). In a products liability setting, the Oklahoma court held that punitive damages are appropriate to be awarded in strict liability cases when:
 
 
 87
 ... the injury is attributable to conduct that reflects reckless disregard for the public safety. "Reckless disregard" ... [means that the defendant] must either be aware of, or culpably indifferent to, an unnecessary risk of injury ... [and] must also fail to determine the gravity of the danger or fail to reduce the risk to an acceptable minimal level. "Disregard for the public safety" reflects a basic disrespect for the interests of others.
 
 
 88
 Id. at 518 (emphasis in original) (footnotes omitted). We have no doubt that Oklahoma would extend this rule to strict liability cases based on deficient conduct of ultrahazardous activities. Thus, in the case at bar, a punitive award based on the strict liability property damage award is permissible and appropriate, provided that the evidence demonstrates the requisite degree of culpability on Kerr-McGee's part.
 
 
 89
 WHAT IMPACT, IF ANY, DOES THE OKLAHOMA WORKERS' COMPENSATION
 
 
 90
 ACT HAVE ON THE PUNITIVE AWARD?
 
 
 91
 We next turn to consideration of what impact the Oklahoma Workers' Compensation Act, Tit. 85 O.S.1981, has on the punitive award. In a previous opinion in this same case, we held that 85 O.S.1981 Sec. 12 made Workers' Compensation the exclusive remedy for job-related physical injuries, that Karen Silkwood's physical injuries were job-related, and that accordingly the Oklahoma Workers' Compensation Act precluded the trial court from awarding Silkwood's estate actual damages based on her physical injuries. 667 F.2d 908, 916-20 (10th Cir.1981). We need consider only the discrete question of whether 85 O.S.1981 Sec. 12 bars the consideration of evidence concerning a Workers' Compensation-covered injury in connection with a judicially cognizable claim for punitive damages.
 
 
 92
 Were Silkwood's estate seeking only actual damages for her physical injuries, we believe that the Supreme Court of Oklahoma would hold that 85 O.S.1981 Sec. 12 effectively precluded any award of punitive damages. This is so because Sec. 12 precludes a court from awarding actual damages to compensate Silkwood for her job-related physical injuries. A proper award of at least nominal actual damages is, as noted above, a necessary predicate for a punitive award under Oklahoma law, and because no actual damages could be awarded, no punitive award could be made. Under the circumstances of the case as it is, however, the Workers' Compensation Act has no bearing on the availability of punitive damages. There is an independent claim for property damages that occurred away from Kerr-McGee's plant. This award satisfies the actual damages requirement for a punitive award. Our position is that a punitive award could be made in this case.
 
 
 93
 Kerr-McGee's argument is that given the fact that a punitive award is proper, the jury's punitive award of $10 million in this case was "tainted" by the introduction of evidence concerning Silkwood's physical injuries. Its claim is that a new trial must therefore be ordered. On the contrary this outrageous and shocking occurrence should not be repeated. The punitive damages award made is, as shown above, not considered to be a compensatory award. Thus, the award, even if based in part on the fact that Silkwood suffered personal injuries as a result of Kerr-McGee's conduct, does not violate 85 O.S.1981 Sec. 12's mandate that Workers' Compensation be the sole remedy available to compensate workers for job-related physical injuries. Nor does the introduction of evidence concerning Silkwood's physical injuries, their likely effects, and the circumstances under which they occurred "taint" the punitive award. We have shown through the cases that punitive awards under Oklahoma law are based on the culpability of a defendant's course of conduct. The evidence concerning Silkwood's personal injuries that was admitted at trial is thus relevant to the jury's determination of Kerr-McGee's culpability. The evidence had a strong bearing on Kerr-McGee's safety record, its attitude toward the dangers of plutonium, and the circumstances surrounding the contamination of Ms. Silkwood's apartment. Since the trial court's jury instructions directed the jury to focus primarily on the nature of Kerr-McGee's conduct, and not on the severity of Silkwood's physical injuries, in assessing punitive damages, see Instructions No. 19, 27, reprinted in 485 F.Supp. at 603, 606, we hold that evidence concerning Silkwood's physical injuries was properly admitted into evidence. It was properly considered by the jury in awarding punitive damages. Moreover, the jury is entitled to consider the same evidence in assessing punitive damages against Kerr-McGee, albeit under slightly different instructions, if we were to order a new trial on the issue. The trial was legally sufficient and a repetition would be wasteful.
 
 
 94
 WAS THE PUNITIVE AWARD JUSTIFIED?
 
 
 95
 We now consider whether the punitive award is justified by the evidence introduced at trial. In reviewing the award, we must view the evidence in the light most favorable to the prevailing party. Timmons v. Royal Globe Insurance Co., 653 P.2d 907, 918 (Okla.1982). We may reverse the trial court's decision to uphold the award only if that decision is an abuse of discretion, Barnes v. Smith, 305 F.2d 226 (10th Cir.1962), or if the jury verdict itself is motivated by passion, prejudice or undue sympathy, Timmons, 653 P.2d at 919. We also note that under Oklahoma law, a remittitur as to actual damages such as we ordered in our first opinion does not require that a punitive damages award also be reduced. Hobbs v. Watkins, 481 P.2d 746, 754 (Okla.1971).
 
 
 96
 In our first opinion, we held that Oklahoma would find plutonium processing to be an ultrahazardous activity, and that Kerr-McGee should be held strictly liable for any damages caused by the escape of its plutonium. 667 F.2d 908, 921 (10th Cir.1981). Since strict liability applies, Oklahoma would hold Kerr-McGee to a standard of utmost due care and would require Kerr-McGee to take all possible precautions to safeguard against even the most minimal risk of harm from its operations.[1] See Foster & Keeton, Liability Without Fault in Oklahoma, 3 Okla.L.Rev. 172 (1951). Moreover, Oklahoma would find punitive damages to be appropriate if Kerr-McGee's handling of ultrahazardous plutonium reflected a reckless disregard for public safety. See Thiry v. Armstrong World Industries, 661 P.2d 515, 518 (Okla.1983).
 
 
 97
 The evidence concerning the contamination of Karen Silkwood's apartment was highly relevant and is entitled to careful review. If it was not given full attention an important aspect of the case would be excluded. There is ample evidence not only to permit the punitive damages issue to be submitted to the jury, but also to support the punitive damages award that the jury returned. Kerr-McGee conceded that the plutonium found in Ms. Silkwood's apartment came from its plant, and the jury found that Ms. Silkwood had not intentionally removed the plutonium from the plant. Thus, Kerr-McGee was strictly liable for the harm caused by its plutonium, and the question becomes whether Kerr-McGee's course of conduct reflected a reckless disregard for public safety.
 
 
 98
 THE EVIDENCE SUPPORTS THE CONCLUSION THAT KERR-McGEE FAILED
 
 
 99
 TO PROVIDE SUPPORT CAPABLE OF PROTECTING AGAINST
 
 SILKWOOD'S CONTAMINATION
 
 100
 There is substantial evidence in the record to demonstrate that both before[2] and in connection with the Silkwood contamination incident, Kerr-McGee failed to use the utmost care in its processing facility at Cimmaron, and that it fell short of even the standard that Oklahoma would impose under ordinary negligence principles. The record shows that Kerr-McGee did not take precautions to protect the general public from the escape of plutonium from its plant and that its conduct reflected reckless indifference for public safety.
 
 
 101
 The Cimmaron plant was not designed to satisfy the most simple principles of human factors engineering. The facility was cramped. The plant did not incorporate sufficient safety systems, such as "state of the art" alarm systems, leak detectors, air monitoring systems, and welded gaskets, into its design. The evidence showed that the plant's management was recklessly indifferent to the health and safety of its workers. Kerr-McGee hired unqualified health physics personnel. It knew of the life-threatening character of plutonium escape, but failed to warn employees of the importance of contamination control. Moreover, workers were never informed of the health hazards of plutonium contamination.
 
 
 102
 There is record evidence that Kerr-McGee continuously exposed also the general public to a risk of contamination through lax physical security at the plant. Kerr-McGee did not provide adequate health and safety training. This in all likelihood led to that many significant contamination events. Several of these critical events were emblematic of a conscious indifference to the welfare of the general public. For example, in April of 1972, three workers contaminated a local restaurant after leaving the plant tainted with plutonium. When Kerr-McGee management learned of the incident, they did not contact either the restaurant or the Atomic Energy Commission. But, even after that incident, Kerr-McGee continued to employ lax contamination controls. Kerr-McGee was unable to account for 25 pounds of plutonium in less than a month from October 15 to November 7, 1974.
 
 
 103
 The contamination of Karen Silkwood's apartment upon which liability in this case is based was within the radius of the abnormal risk to the general public. Kerr-McGee's lax security procedures and controls were significant factors in the escape of plutonium from its custody. All of Karen Silkwood's belongings, including items irreplaceable and of substantial sentimental character, were contaminated. These had negligible monetary value. Nevertheless they were contaminated and had to be destroyed. This destruction flowed from Kerr-McGee's failure to prevent the escape of plutonium from its plant. The record also discloses that there were numerous other incidents which reflected Kerr-McGee's lack of concern about the release of plutonium and the risks that release posed to the general public. Kerr-McGee simply pointed to the loose standards of the government.
 
 
 104
 The district court correctly concluded that "the amount of the punitive damages was particularly within the province of the jury to decide in light of the purpose of punitive damages, the character of defendant's conduct, the hazardous nature of plutonium, and defendant's knowledge and state of mind." 485 F.Supp. 566, 591 (D.Okla.1979). The record evidence permits one to conclude that the jury performed its function dispassionately and well. This result expressed the jury reaction and the reaction of the nation as a whole to the fatal consequences of the negligent treatment of this material. The punitive award was proportionate to the culpability of Kerr-McGee's dangerous conduct. It was not motivated by passion, prejudice, or undue sympathy. Accordingly, therefore, there is no basis for disturbing the award.
 
 THE REMAINING ISSUES
 
 105
 There remain only three brief issues to be resolved. I am unable to consistently embrace the position of Kerr-McGee as to these.
 
 
 106
 First, Kerr-McGee's argument that the punitive award must be reversed because the punitive damages/actual damages ratio of 2000:1 is disproportionate as a matter of law. Kerr-McGee's argument must be rejected, for Oklahoma law explicitly rejects the use of a ratio approach in evaluating punitive awards. Timmons v. Royal Globe Insurance Co., 653 P.2d 907, 918 (Okla.1982). So long as the award is reasonably related to the harm to society caused by the defendant's conduct, id., and will not bankrupt the defendant, Thiry v. Armstrong World Industries, 661 P.2d 515, 518 (Okla.1983), an appellate court should defer to the jury's judgment on punitive damages, Timmons, 653 P.2d at 918. Accordingly, we should reject Kerr-McGee's ratio argument.
 
 
 107
 Kerr-McGee's second argument is that the trial court's instructions to the jury on the effect of compliance with federal regulations were fatally flawed. Once again, we should reject this argument. Oklahoma law does not make mere compliance (or "substantial compliance") with statutory or regulatory requirements conclusive proof of due care. See Transport Indemnity Co. v. Page, 406 P.2d 980 (Okla.1965); Roadway Express, Inc. v. Baty, 189 Okl. 180, 114 P.2d 935 (1941). The trial court correctly instructed the jury that the federal regulations, and the degree of Kerr-McGee's compliance with those regulations, were entitled to substantial weight in determining whether Kerr-McGee had exercised due care in its handling of plutonium. See Instructions No. 10, 11, 12 and 27, reprinted in 485 F.Supp. at 598-99, 606-07. The trial court also instructed the jury that those regulations, and Kerr-McGee's compliance, did not conclusively prove due care under all the circumstances. See id. These instructions fully describe Oklahoma law; they are fully consistent with the principle, embodied in the Supreme Court's opinion, that Oklahoma may impose a common-law standard of care higher than that imposed by federal regulations on nuclear activities. I submit that no problem arises in connection with the trial court's jury instructions on compliance with federal regulations. Kerr-McGee's position fails to justify such an attack.
 
 
 108
 Kerr-McGee's third argument is that it was denied a fair trial due to anti-nuclear publicity arising out of the Three Mile Island incident and the movie, "The China Syndrome," and due to the courtroom histrionics of plaintiff's trial counsel, G.L. Spence. This position is also ill fit for the occasion. The trial judge repeatedly admonished the jury to disregard both extraneous publicity and the trial histrionics of plaintiff's counsel. When Kerr-McGee raised these issues before the district court in its post-trial motions, that court rejected Kerr-McGee's arguments of unfairness. Since the trial judge was in the best position to judge the overall fairness of the trial, we may reverse his decision on this issue only if it was a gross abuse of his broad discretion. Rodgers v. Hyatt, 697 F.2d 899, 901 (10th Cir.1983). In light of the strong cautionary admonitions to the jury that the trial court gave throughout the trial, and in light of the presumption that must be accorded that the jury performed its function fairly, I certainly cannot say that the district court abused its discretion in holding that Kerr-McGee received a fair trial. The case was tried with utmost care and any new trial could not provide improvement.
 
 
 109
 Our brothers, Judges McKay and Logan, refuse to face the general nature of this case. They fail to recognize its total magnitude of the condition created by Kerr-McGee. There has not been a previous situation which brought into focus the tremendous power of the material. It is understandable that Kerr-McGee's reaction is one which clings to its effort to treat the condition as an ordinary result and which also turns away from the reality of this tragedy. The truth though is that the treatment of Silkwood shook the entire nation. Her suffering and death will not be soon forgotten.
 
 
 110
 Kerr-McGee's arguments for reversal or a new trial do not justify either a reversal or a six-week retrial. The award of punitive damages is not at all excessive in the light of the needless and excessive injury.
 
 
 111
 The punitive damages are the sole reminders of her life and death. The evidence and the verdict serve to call attention to the danger from the misuse of the material and its tragic result. How can a new trial and a different verdict improve the present result? How can a different result serve to remind those who remain of the true symbol of the material and what it stands for?
 
 
 112
 With the foregoing in mind I respectfully submit that the prior judgment should be affirmed.
 
 
 
 [1]
 Civil Rights Act and federal constitutional claims were also asserted in the original petition. The trial court's dismissal of those claims was affirmed in a separate appeal. Silkwood v. Kerr-McGee Corp., 637 F.2d 743 (10th Cir.1980), cert. denied, 454 U.S. 833, 102 S.Ct. 132, 70 L.Ed.2d 111 (1981)
 
 
 [2]
 The opinion of the trial court overruling Kerr-McGee's post-trial motions is reported at 485 F.Supp. 566 (W.D.Okla.1979)
 
 
 [3]
 Silkwood v. Kerr-McGee Corp., 667 F.2d 908 (10th Cir.1981)
 
 
 [4]
 Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984)
 
 
 [5]
 What follows is a brief review of the facts set out in more detail in our first opinion, 667 F.2d 908 (10th Cir.1981)
 
 
 [6]
 A glove box is a supposedly impervious box surrounding the plutonium processing equipment that has glove holes permitting the operator to work with the equipment or with plutonium from outside the box
 
 
 [7]
 Now the Nuclear Regulatory Commission
 
 
 [8]
 There is conflict among the circuits on the question of whether it is proper to apply a state or federal test of sufficiency of the evidence to support a jury verdict in a case where federal jurisdiction is rested on diversity of citizenship. Compare Kuziw v. Lake Engineering Co., 586 F.2d 33 (7th Cir.1978) (state law applies in determining motions for directed verdicts and for judgments notwithstanding the verdict) with John Hancock Mutual Life Ins. Co. v. Dutton, 585 F.2d 1289 (5th Cir.1978) (federal law standard is to be applied in assessing whether judgment notwithstanding the verdict should be granted)
 The Oklahoma standard for assessing the sufficiency of the evidence in support of a jury verdict differs somewhat from the federal standard. The Oklahoma Supreme Court has held that:
 A motion for directed verdict ... should not be sustained unless there is an entire absence of proof tending to show a right to recover, and in passing on the same the trial court must consider as true, all of the evidence favorable to the party against whom motion ... is directed together with all inferences that reasonably may be drawn therefrom and disregard all conflicting evidence favorable to the movant.
 Austin v. Wilkerson, Inc., 519 P.2d 899, 903 (Okla.1974) (quoting Central Mutual Ins. Co. v. Dickason, 451 P.2d 1 (Okla.1969)) (emphasis added). Even if Oklahoma state law on this question were to be applied in this case, however, our decision on this issue would be the same, because whatever the differences in nuance between the Oklahoma standard and the federal standard, it is clear that Kerr-McGee's motion for judgment notwithstanding the verdict on the ground of insufficient supportive evidence must fail under either.
 
 
 [9]
 Justice Blackmun stated that the
 punitive damages award ... enables a State to enforce a standard that is more exacting than the federal standard. Were Kerr-McGee to continue adherence only to the federal standard, it would presumably be in continuous violation of state law--an indication that the jury award in this case was too small to serve its purpose. A licensee that continues to meet only the federal standard therefore presumably will receive increasingly large punitive sanctions in subsequent personal injury suits, until compliance with the state-imposed safety standard is obtained.
 
 
 [104]
 S.Ct. at 630. Justice Powell in his dissent noted that:
 The Court's decision, in effect, authorizes lay juries and judges in each of the states to make regulatory judgments as to whether a federally licensed nuclear facility is being operated safely. Such judgments then become the predicate to imposing heavy punitive damages. This authority is approved in this case even though the Nuclear Regulatory Commission (NRC)--the agency authorized by Congress to assure the safety of nuclear facilities--found no relevant violation of its stringent safety requirements worthy of punishment.
 
 
 [104]
 S.Ct. at 634
 
 
 [10]
 Const. art. XVI, S. 26
 
 
 [11]
 Tex.Rev.Civ.Stat.Ann. art. 8306, S. 5 (Vernon 1967)
 
 
 [12]
 Fla.Stat. Sec. 627.730 (1979)
 
 
 [13]
 Defendants argue that our prior decision is res judicata on remand. See 1B Moore's Federal Practice p 0.404 [4.3] (2d ed. 1982). In light of our disposition we need not reach this issue
 
 
 [1]
 The Supreme Court's holding that state tort law is not preempted by federal nuclear regulation permits Oklahoma to impose strict liability and a standard of utmost due care upon Kerr-McGee. 104 S.Ct. at 624-25
 
 
 [2]
 Evidence of Kerr-McGee's handling of plutonium prior to the contamination incident was properly admitted at trial to show Kerr-McGee's knowledge of the hazards of plutonium and its attitude toward those hazards. Edgar v. Fred Jones Lincoln-Mercury of Oklahoma City, Inc., 524 F.2d 162 (10th Cir.1975)