CHIEF JUSTICE GRAY,
concurring in part and dissenting in part.
¶128 I concur in the results the Court reaches on all issues, but do not join in several aspects of the Court’s reasoning, particularly where the Court fails to address either the record before us or the arguments presented and where it unnecessarily relies on authorities from other jurisdictions. I respectfully, but vigorously, disagree with the Court’s characterization of Texaco’s Article II, § 3-related argument in Issue 3 as a challenge to any damages other than the restoration costs award, or to the viability of Sunburst’s constitutional tort claim. I also note Texaco frames its CECRA and Article II, § 3-related *300 arguments-addressed by the Court in Issues 2 and 3-as separate issues in its statement of issues, but briefs them as subparts of its overarching argument pertaining to the availability of restoration costs pursuant to the footnote exception to the Burk Ranches permanency presumption. To the extent that the results of Issues 2 and 3 are to affirm the restoration costs award on this record, I concur with the Court.
Restoration costs-Issue 1
¶129 Regarding Issue 1, I respectfully disagree with the Court’s adoption of the “personal use” rule (sometimes called “reasons personal”) from the Restatement (Second) of Torts § 929 and comment b thereto-and its apparent determination that the “personal use” rule satisfies the footnote exception to the Burk Ranches permanency presumption here-because I do not believe the “personal use” rule sufficiently fits the facts of this case. In this respect, I also disagree with the breadth of the Court’s statements in ¶¶ 38-39, insofar as the Court suggests that other courts have held the “personal use” rule applies whenever a court determines diminution in value is not “adequate’-without requiring a record showing of “personal use”-and that “collateral beneficiaries” may recover restoration damages based solely on other plaintiffs’ “personal uses.”
¶130 The record is largely silent on most plaintiffs’ use of their properties; however, it does reflect that the plaintiffs include the partnership Sonnemaker Farms, estates of deceased property owners, people whose listed addresses are not in Sunburst, and the school district. Only six of the approximately 90 plaintiffs testified at trial. School board representative Linda Clark responded affirmatively when asked if she was “just generally” familiar with how the school property was utilized, and stated she did not know if a particular building was used for equipment storage. Property owner Donald Revell testified he had moved to Troy and was trying to sell his Sunburst property at the time of trial. Ray Schock stated his property included not only his home, but also four lots that he had at one time considered selling.
¶131 This record falls far short of supporting the Court’s implied presumption that all-or even most-of the plaintiffs had residential or other “personal uses.” As set forth in Roman Catholic Church, plaintiffs seeking restoration damages under the “personal use” rule must actually establish a “personal use”-a residential or other “not purely financial” personal interest in the property-and that they would restore the property to facilitate a non-income-producing use. Roman Catholic Church, 618 So.2d at 878-80. It is my view that, at most, the *301 “personal use” rule would apply in this case only to testifying plaintiffs who established a residential or other personal use and to the school district, insofar as its use and interest were “not purely financial.” The Court’s broad application of § 929 and comment b in this case totally swallows the “personal use” and “not purely financial interests” components of the rule it has adopted. I cannot agree.
¶132 Moreover, I believe the Court’s statement of the “personal use” rule is much more rigid than the language of the out-of-state cases from which the Court derives it. In ¶ 33, the Court cites to the Colorado Fowler Trust and Slovek cases for the proposition that diminution in value will not restore a plaintiff who resides on damaged real property to the same position as before any tort was committed. As set forth in Fowler Trust, however, Slovek states a trial court has discretion to select restoration costs as an appropriate remedy; to facilitate appellate review, a trial court should articulate its reasons for awarding restoration costs as opposed to diminution in value; and “the factors that merit awarding restoration costs are not fixed, and... to make them so would forfeit the flexibility trial courts need to achieve fair results.” Fowler Trust, 17 P.3d at 805 (citing Slovek, 723 P.2d at 1315-17).
¶133 In ¶ 34, the Court accurately cites to Roman Catholic Church for the statement-which, there, is a quote from a 1973 treatise on remedies-that the “only” remedy for property damage is restoration costs when the plaintiff wishes to use, rather than sell, the property. What the Court totally fails to acknowledge, however, is that the Roman Catholic Church opinion “book-ends” that quote with statements that “no mechanical rule can be applied with exactitude ... [and] every case must rest on its own facts and circumstances[,]” and “ ‘[r]ules governing the proper measure of damages in a particular case are guides only and should not be applied in an arbitrary, formulaic, or inflexible manner, particularly where to do so would not do substantial justice.’ ” Roman Catholic Church, 618 So.2d at 877 (citations omitted). In my view, Roman Catholic Church-read as a whole-emphasizes flexibility and the need for case-by-case analysis. The “only” statement from that decision cannot properly be read in isolation.
¶134 In sum, I believe the out-of-state “personal use” rule cases cited by the Court are consistent with existing Montana jurisprudence providing for flexibility and case-specific considerations, which I discuss further below. Along similar lines, I strongly disagree with the Court’s intimation in ¶¶ 45-49 that a “strict cap” for property damages *302 heretofore has existed in Montana, and its suggestion in ¶ 37 that the new “personal use” rule satisfies a previously unmet need for flexibility. If the record supported adoption of the “personal use” rule here, I would neither frame the rule in a manner that categorically limits the remedies available to compensate a plaintiff for property damage, nor remove discretion from a trial court to consider the circumstances of the case before it.
¶135 Finally, regarding my disagreement with the Court’s adoption of the “personal use” rule, I do not believe the parties’ arguments justify it in this case. Texaco’s opening brief does not refer to the “personal use” rule at all. Sunburst’s response brief contains one sentence stating the properties at issue include homes and two schools, and another sentence quoting from Restatement (Second) of Torts § 929 and comment b, as well as a “see also” citation to Roman Catholic Church and Slovek. In its reply brief, Texaco properly discusses Sunburst’s reference to “personal use”-including an assertion, unsupported by the record, that Sunburst did not preserve the “personal use” argument. In my view, Sunburst’s scant “personal use” assertion and Texaco’s reply warrant neither adopting the “personal use” rule nor affording it the status it reaches in the Court’s Opinion.
¶136 Turning now to the record before us and Texaco’s arguments on appeal, Sunburst moved for partial summary judgment on the issue of whether restoration damages were recoverable. Texaco responded to that motion and, in the same document, moved in limine to exclude evidence of alternative restoration proposals-meaning Sunburst’s proposals, which had not been selected by DEQ. Texaco also filed a separate motion in limine to exclude evidence of alternative remediation options-the same Sunburst options not selected by DEQ-under the doctrine of primary jurisdiction.
¶137 Sunburst’s arguments in support of its motion for partial summary judgment on restoration costs were that: (1) the injury in this case was temporary, in light of evidence including Texaco representatives’ deposition testimony; (2) while some courts have traditionally limited damages for temporary injury to the lesser of restoration costs or diminution in value, other courts and commentators have reasoned that this limitation does not always adequately restore plaintiffs to their pre-injury positions, especially in cases involving expensive environmental remediation; (3) the footnote exception to the Burk Ranches permanency presumption constitutes Montana’s recognition of public policy reasons for not limiting damages in certain cases, including environmental cases; and (4) Montana *303 public policy, as articulated in the Montana Constitution and this Court’s cases on environmental and property issues, satisfies the footnote exception to the Burk Ranches permanency presumption.
¶138 The District Court initially took both Sunburst’s motion and Texaco’s motions in limine under advisement, but subsequently allowed Sunburst to present evidence of alternative remediation methods at trial and instructed the jury to award restoration costs. In its post-trial order denying Texaco’s motions for a new trial and for judgment as a matter of law, the District Court recited the Burk Ranches permanency presumption, which generally provides that an injury is presumed permanent-such that diminution in value is the appropriate remedy-when the cost of repair greatly exceeds diminution in value. See Burk Ranches, 242 Mont. at 307, 790 P.2d at 447. The court then reasoned:
[t]he [Burk Ranches] court also stated, however, that the presumption of permanence is rebuttable, and that restoration damages exceeding the property’s decreased value can be recovered when the circumstances of the case compel repair or replacement of the property. [Citation omitted.] The Court finds the circumstances of this case compel repair of the property. The defendants admit their former operations resulted in pollution of properties owned by the plaintiffs. Limiting those plaintiffs to recovery of diminished property value would do nothing to correct the environmental insult at issue. Under Article II, § 3 of the Montana Constitution, all persons have a fundamental inalienable right to a clean and healthful environment. [Citation omitted.] Restricting the plaintiffs to diminished property value under these circumstances would render that right meaningless. Montana’s strong public policy of environmental preservation is furthered by allowing recovery of restoration damages which will be used to remove pollution from the environment.
¶139 By my reading, the District Court largely adopted Sunburst’s argument that the footnote exception to the Burk Ranches permanency presumption was satisfied here because Montana public policy, as articulated in Article II, § 3 and otherwise, required an award for cleanup rather than an award of diminution in value. In light of this reasoning, I turn to Texaco’s arguments on appeal.
¶140 Texaco first asserts the District Court failed to apply the “general rules” limiting the measure of damages in property tort cases. In this regard, Texaco cites to Burk Ranches, Kebschull v. Nott, 220 Mont. 64, 67, 714 P.2d 993, 995 (1986), and 25 C.J.S. Damages § 84 *304 (1966) for the proposition that, in a case involving injury to land, the appropriate measure of damages is the difference between the property’s values before and after the injury. Texaco also cites to Spackman for the proposition that “[rjecovery ordinarily may not exceed the value of the property just before it was damaged.” See Spackman, 147 Mont. at 507, 414 P.2d at 922.
¶141 Spackman involved sewage flooding, which the plaintiffs claimed had damaged their basement floor and various items of personal property. Spackman, 147 Mont. at 502-04, 414 P.2d at 920. There, we stated the question of how to compensate plaintiffs for property damage is “always a difficult one,” and noted the purpose of compensatory damages is to make the injured party as nearly whole as possible, not to allow realization of a profit. Spackman, 147 Mont. at 506, 414 P.2d at 921. The Court also reasoned:
[i]ngenious men have propounded ingenious methods, systems and formulas for determining in monetary terms the value of property partially damaged or destroyed. While such methods serve as useful guides, the final answer rests in good sense rather than mechanical application of such formulas.
Spackman, 147 Mont. at 506, 414 P.2d at 921-22. Finally, the Court adopted the formula regarding pre-injury market value “as a guide to common sense,” and then stated:
[a]nother guide or measure concerns property damaged but not totally destroyed, in which case the generally accepted estimate of damages is the difference in market value at the place before and after injury. But if repair is possible, and this cost is less than the diminution in value under the general test, this cost plus the value of the loss of use may be employed as the measure. In either case, the recovery ordinarily may not exceed the value of the property just before it was damaged. See generally Damages to Persons and Property, deck, 1961 Ed., § 202, p. 363.
The above principles guide us toward good judgment and fair compensation.
Spackman, 147 Mont. at 507, 414 P.2d at 922.
¶142 Subsequent cases confirm Spackman’s common sense approach that Montana courts will determine the appropriate remedy under § 27-1-317, MCA, by employing certain rules as “guides,” not by applying them rigidly or mechanistically. In Bos-which involved damage to a silo-we quoted the “difficult question” language from Spackman, before discussing the basic objective of making the party whole in light of the “particular fact situation” at issue and determining the guides *305 to measures of damages set forth in Spackman were “clearly not applicable.” Bos, 167 Mont. at 6-8, 534 P.2d at 1260-61. In Whitaker v. Farmhand, Inc., 173 Mont. 345, 355-56, 567 P.2d 916, 922 (1977), we noted that Spackman sets forth “useful guides” not to be mechanically applied. See also Chandler, 197 Mont. at 242-43, 642 P.2d at 1033; Kebschull, 220 Mont. at 66, 714 P.2d at 994. In Kebschull, we concluded, as quoted by Texaco in its opening brief, that “the measure of damages in this case must be the difference between the value of the property before and after the fire.” Kebschull, 220 Mont. at 67, 714 P.2d at 995 (emphasis added). In Burk Ranches, before setting forth the “general rule,” we observed that “no single measure of damages can serve in every case to adequately compensate an injured party[.]” Burk Ranches, 242 Mont. at 305, 790 P.2d at 445-46.
¶143 In asserting the District Court erroneously failed to apply the “general rules” to preclude recovery of restoration costs, Texaco has not attempted to analogize or distinguish the facts or analyses in our prior cases. A district court’s decision is presumed correct, and the appellant has the burden of establishing error. In re Marriage of McMahon, 2002 MT 198, ¶ 7, 311 Mont. 175, ¶ 7, 53 P.3d 1266, ¶ 7 (citation omitted). I conclude Texaco has not met its burden of establishing error by merely reciting flexible and case-specific rules and stating they apply here.
¶144 Texaco next advances the Burk Ranches permanency presumption, which states “[e]ven though repair is theoretically possible, if the cost of repair greatly exceeds the [diminution in value] of the property, the injury is presumptively permanent and the [diminution in value] rule applies.” Burk Ranches, 242 Mont. at 307, 790 P.2d at 447. Texaco contends the District Court improperly refused to instruct the jury to decide whether the injury was permanent and, in support, advances Burk Ranches’ statement that “[w]hether an injury is permanent or temporary is a question for the jury.” Burk Ranches, 242 Mont. at 306, 790 P.2d at 446-47 (citations omitted). Alternatively, Texaco asserts error in the District Court’s failure to apply the permanency presumption as a matter of law.
¶145 Regarding Texaco’s argument that the District Court failed to submit the “temporary or permanent” question to the jury, Burk Ranches defines the “temporary” and “permanent” categories of injury in terms of whether the injury is abatable, or whether the circumstances and character of the injury are such that it is presumed to continue indefinitely. Burk Ranches, 242 Mont. at 306, 790 P.2d at 447 (citations omitted). In its order denying Texaco’s motions for *306 judgment as a matter of law and for a new trial, the District Court reasoned that some cases may present an issue of fact regarding whether an injury is permanent or temporary, but Texaco had provided no evidence in this case suggesting the injury was permanent. On appeal, Texaco challenges neither this reasoning, nor similar reasoning in other District Court orders that all evidence submitted before trial established the injury was abatable. Thus, I conclude that Texaco has not established error regarding the court’s failure to present the “temporary or permanent” question to the jury.
¶ 146 With respect to Texaco’s assertion that the District Court erred in failing to apply the permanency presumption as a matter of law, the parties agree the restoration costs in this case “greatly exceed” the diminution in value. Thus, their arguments center on whether the District Court erred in applying the Burk Ranches footnote exception, under which the permanency presumption “can be overcome by statutory and common laws, such as environmental laws, which compel repair or replacement.” Burk Ranches, 242 Mont. at 307 n.3, 790 P.2d at 447 n.3.
¶147 Texaco asserts Sunburst has not claimed that restoration damages were compelled by any “specific” environmental law. The word “specific” does not appear in the footnote exception and, in any event, the District Court cited to Article II, § 3, the “right to a clean and healthful environment.”
¶ 148 I would conclude Texaco has not established error in the award of restoration costs via its “Issue 1” arguments addressed above regarding the “general rules” and Burk Ranches. Thus, like the Court, I would affirm on this issue, but I would do so without adopting the “personal use” rule.
Texaco’s CECRA Arguments-Issue 2
¶149 Unlike the Court, I would not address the merits of Texaco’s CECRA arguments. In its opening brief, Texaco asserts CECRA precludes a party from bringing a “claim” for restoration costs. As Sunburst observes, however, Texaco did not plead claim preemption as an affirmative defense and, therefore, has waived that defense. See Winslow v. Montana Rail Link, Inc., 2005 MT 217, ¶¶ 37-38, 328 Mont. 260, ¶¶ 37-38, 121 P.3d 506, ¶¶ 37-38; M. R. Civ. P. 8(c). For that reason, I do not address Texaco’s reliance on cases regarding exhaustion of administrative remedies before filing suit and courts’ deference in appeals from administrative agency decisions.
¶150 Texaco adamantly asserts in its reply brief, however, that its argument is not that CECRA precludes Sunburst from bringing its *307 claims, but that CECRA precludes the remedy of restoration costs as a form of damages. By my reading, Texaco’s argument is not that a jury may never award restoration costs-as our prior cases discussed above clearly establish it sometimes may-but that neither a judge nor a jury may usurp DEQ’s role in evaluating the merits of alternative remediation plans. In that respect, Texaco is challenging the basis for an award of restoration costs, rather than merely the jury’s ability to award restoration costs as damages. Thus, I conclude Texaco’s “preclusion” arguments are claim preemption arguments and, as set forth above, would not address them because they were not pled as an affirmative defense.
¶151 Texaco also argues in its reply brief, however, that regardless of its failure to plead claim preemption as an affirmative defense, Sunburst was on notice with respect to Texaco’s CECRA-related arguments because Texaco asserted these arguments in certain documents filed in the District Court. Among these documents, as mentioned above, is Texaco’s motion in limine to exclude evidence of alternative remediation options under the doctrine of primary jurisdiction. In its separate motion in limine to exclude evidence of alternative restoration proposals, Texaco referred the District Court to its “primary jurisdiction” motion and made the “general rules” and Burk Ranches permanency presumption arguments discussed above in Issue 1. Texaco also lists documents that either do not mention CECRA at all, or mention CECRA only in relation to different matters, including Texaco’s Article II, § 3-related argument-which I address in Issue 3. Thus, Texaco’s only District Court CECRA “preclusion” argument not already addressed is its reliance on the doctrine of primary jurisdiction.
¶152 In a footnote to its reply brief here, however, Texaco states that Sunburst’s discussion of the doctrine of primary jurisdiction is “off the point.” This is Texaco’s only mention of the doctrine. On this record and in my view, the only reasonable construction of Texaco’s “off the point” remark is that Texaco has abandoned its reliance on the doctrine of primary jurisdiction-which is the only CECRA “preclusion” argument it properly preserved in the District Court. Thus, I would not further address Texaco’s arguments that CECRA precluded the remedy of restoration damages in this case.
¶153 For these reasons, I conclude Texaco has not established error in the award of restoration costs. Consequently, to the extent the Court’s result in Issue 2 affirms the award of restoration costs, I concur.
*308 Texaco’s Article II, § 3 argument-issue 3
¶154 Regarding Issue 3, I respectfully, but strongly disagree with the Court’s characterization of Texaco’s Article II, § 3 argument as a challenge to the viability of Sunburst’s constitutional tort claim or to any damages other than the $15 million restoration costs award. As discussed below, I believe Texaco’s argument is that Article II, § 3 is not a law “compelling” restoration for purposes of awarding restoration damages for trespass, as contemplated in the footnote exception to the Burk Ranches permanency presumption, because Article II, § 3 is, in Texaco’s view, not self-executing.
¶155 Sunburst brought several tort claims, including a constitutional tort claim for violation of Article II, § 3. As set forth in Issue 1, the District Court cited to Article II, § 3 in determining that restoration costs were appropriate because the footnote exception to the Burk Ranches permanency presumption was satisfied here. Thus, Article II, § 3 was the basis for both the constitutional tort claim and the District Court’s Burk Ranches analysis pertaining to restoration costs. As discussed below, however, Texaco has not raised an issue about the constitutional tort claim. Its assertion of error pertains solely to the District Court’s reliance on Article II, § 3 in awarding restoration costs, which were not awarded for the constitutional tort.
¶156 Certain portions of the special verdict form are, in my view, critical to understanding and properly addressing Texaco’s arguments on appeal. Question 1 stated the District Court had determined as a matter of law that Texaco trespassed on certain plaintiffs’ property, and a question of fact remained about whether other plaintiffs’ properties were located on the plume of contamination. The jury determined, pursuant to question 1, that some of those “question of fact” plaintiffs’ properties were on the plume, and others were not. Question 1 further directed the jury to award damages for trespass by answering questions 14 through 16.
¶157 Question 2 stated the District Court had determined as a matter of law that Texaco was strictly liable for any damages caused by the release of gasoline constituents and petroleum hydrocarbons. Question 2 then asked the jury whether the release caused damage to the plaintiffs who owned properties on the plume. The form provided no space, however, for the jury to answer the factual causation question. Question 3 stated that, if the jury’s answer to question 2-the question regarding causation which provided no space for the jury to answer-was “yes,” it was to award damages by answering questions 14 through 16. Under question 14, the jury awarded $15 million, as a *309 “[s]ingle award of restoration damages for all Plaintiffs collectively,” to restore the plaintiffs’ properties to the condition they were in prior to the contamination. As discussed below, this is the award Texaco challenges on appeal.
¶158 Questions 4 and 5 asked the jury whether Texaco violated Sunburst’s constitutional right to a clean and healthful environment and whether that violation of Sunburst’s constitutional right caused damage to the plaintiffs, and the jury answered “yes” to both questions. The form provided that, since the jury answered “yes” to both questions 4 and 5, it was to award damages by answering question 18 of the special verdict form. In addition, the form instructed that, if the jury answered “yes” to a question regarding Sunburst’s public nuisance claim-which it did-it was to answer question 18 of the special verdict form. Question 18 listed the plaintiffs and provided a blank space next to each plaintiffs name for the jury to write an amount of damages, if any, to be awarded to each plaintiff. In question 18, the jury awarded the listed plaintiffs amounts ranging from $1,500 to $20,000, for a total of $226,500. As set forth below, Texaco does not challenge this award.
¶159 Before discussing Texaco’s arguments on appeal, I highlight three important points demonstrated by the special verdict form. First, the jury awarded $15 million in restoration costs pursuant to question 14, which the form instructed the jury to answer only in relation to the trespass and strict liability claims. Second, because the jury did not-indeed, could not-answer the causation question with respect to the strict liability claim, a plain reading of the special verdict form establishes that the $15 million restoration costs award was for the trespass claim only. Third, the District Court entered judgment as a matter of law on Sunburst’s trespass claim and elements of the strict liability claim, not any portion of the constitutional tort claim.
¶160 On appeal, Texaco consistently refers to the $15 million awarded pursuant to question 14 as “restoration damages,” “remediation damages,” or “restoration costs.” By contrast, it refers to the damages awarded in questions 16 through 19-including the $226,500 awarded in question 18 for nuisance and constitutional tort-as “individualized damages.” In its statement of issues, argument headings, and substantive arguments, Texaco directs its Article II, § 3-related arguments toward the $15 million in restoration damages-and does not challenge the $226,500 in “individualized damages” awarded for constitutional tort and nuisance. Thus, in my view, the arguments presented in Texaco’s briefs clearly do not *310 challenge the viability of the constitutional tort claim or the $226,500 awarded for the constitutional tort and public nuisance claims pursuant to question 18.
¶161 In addition, Texaco has not briefed any argument that the $15 million in restoration costs were awarded for Sunburst’s constitutional tort claim. In Section V(F) of the statement of facts in its opening brief, Texaco observes it objected to three jury instructions setting forth a restoration measure of damages for trespass, strict liability and constitutional tort-jury instructions 16, 17 and 19, respectively (the numbering of which is unrelated to the special verdict form questions discussed above). Texaco’s briefs do not, however, present argument or authorities regarding jury instruction 19 or any other jury instruction on damages relating to Sunburst’s constitutional tort claim. Rather, in its Article II, § 3-related arguments regarding restoration damages, Texaco uses the terms “directing verdicts” and “directed” — which I interpret as references to the District Court’s judgments as a matter of law on the trespass claim and on elements of the strict liability claim. In addition, Texaco cites to only those portions of the special verdict form and jury instructions relating to damages for trespass and strict liability (with one exception, which I believe must be a typographical error, because the cited jury instruction does not refer to damages at all). Thus, Texaco’s briefs posit that the challenged $15 million in restoration damages was awarded for trespass or strict liability or both, not for constitutional tort.
¶162 A plain reading of the jury’s special verdict form indicates that trespass was the sole claim underlying the $15 million restoration costs award. Texaco has not-in the District Court or here-addressed the irregularity in the special verdict form resulting in the jury’s inability to answer a threshold causation question regarding strict liability. Nor has it offered any authority that would “trump” a plain reading of the special verdict form, with respect to jury instruction 19 or otherwise. Thus, in my view, the record mandates a conclusion that the jury awarded $15 million in restoration costs for the trespass claim only, and Texaco’s briefed arguments clearly pertain only to that award.
¶163 In this respect, I note counsel made certain assertions at oral argument that I do not believe are properly before us. We scheduled two separate oral arguments, to be held on the same day, in this case. For the morning session, we consolidated this case with two other cases and derived our statement of the “environmental issues” to be argued from one of the other cases. Those issues were: (1) whether *311 Article II, § 3 is self-executing; (2) whether a Bivens-type action would lie for violation of the right to a clean and healthful environment; and (3) whether such an action could be brought against a private entity. We explained in our classification order that the three issues “encompass[ed]” those raised in all three cases. The afternoon session included only this case and was limited to the appeal and cross-appeal issues other than the “environmental issues.”
¶ 164 At the morning session, Texaco’s counsel stated a belief that no constitutional tort exists for violating Article II, § 3. It is important to note, in this respect, that Texaco did not appeal from the District Court’s pretrial order denying its motion for judgment on the pleadings regarding Sunburst’s constitutional tort claim. Moreover, I reiterate my view that Texaco’s briefs frame the issue of whether Article II, § 3 is self-executing only in relation to the District Court’s Burk Ranches analysis of the availability of restoration costs for trespass-addressed below. The only reference in Texaco’s briefs to a Bivens-type action is the parenthetical phrase “Bivens action” after a citation to a federal case. That parenthetical phrase, standing alone, does not raise a Biuens-related issue regarding Sunburst’s constitutional tort claim. Thus, I do not believe counsel’s oral argument assertion regarding the viability of the constitutional tort claim is properly before us.
¶165 Also at the morning argument, Texaco’s counsel asserted that if the District Court correctly determined the constitutional tort claim was viable, the issue before us is the appropriate measure of damages for the constitutional tort claim. At the afternoon session, another of Texaco’s attorneys asserted that a jury instruction-apparently jury instruction 19-indicated the jury awarded $15 million in restoration costs for the constitutional tort claim. Texaco simply did not brief any argument regarding the damages for constitutional tort, nor did our classification order authorize Texaco to raise these contentions for the first time at oral argument. Moreover, as discussed above, any assertion that the jury awarded restoration costs for the constitutional tort claim is belied by a plain reading of the jury’s special verdict form.
¶166 I recognize some confusion may have arisen regarding what issues were “fair game” at each oral argument. In my view, however, counsel for Texaco did not properly or sufficiently raise and support any “new” assertions at that time. To the extent the Court’s analysis addresses these “new” assertions relating to the constitutional tort claim or attempts to force Texaco’s arguments into the “mold” of our statement of the issues in the classification order, I cannot agree.
*312 ¶167 It remains necessary, however, to address Texaco’s briefed arguments regarding Article II, § 3-that the District Court erred in relying on Article II, § 3 in its Burk Ranches analysis and in determining, as a result, that restoration costs were to be awarded for trespass. Texaco’s arguments boil down to an assertion that Article II, § 3 does not compel the damages remedy of restoration costs for trespass under the Burk Ranches footnote exception because Article II, § 3 is, in Texaco’s view, not self-executing and the Legislature has enacted laws (namely, CECRA) to implement Article II, § 3.
¶168 Other than generally asserting Article II, § 3 does not “compel” remediation damages-an apparent reference to the “laws which compel repair or replacement” language in the footnote exception to the Burk Ranches permanency presumption-Texaco does not address any relationship between the footnote exception and its “non-self-executing” arguments. In my opinion, Texaco cannot establish error in the restoration costs award without addressing what the Burk Ranches footnote exception means, and whether the District Court’s interpretation of the footnote exception-in relation to the asserted non-self-executing nature of Article II, § 3 or otherwise-was correct.
¶169 I conclude Texaco has not established error in the District Court’s application of Article II, § 3 in its analysis under Burk Ranches. Having so concluded, I would not further address Texaco’s argument that Article II, § 3 is not self-executing.
¶170 For the foregoing reasons, I strenuously, but respectfully, disagree with the Court’s analysis of this issue. I concur, however, insofar as the result the Court reaches is to affirm the award of restoration costs.
Expert Testimony Sanction-Issue 4
¶171 It appears that the Court has experienced a form of “issue drift,” insofar as it properly states Issue 4 as one concerning a remedy for violating the scheduling order and M. R. Civ. P. 26(b)(4)(A)(i) in ¶ 6, but addresses the District Court’s exclusion of expert testimony in ¶¶ 68 and 73 as a ruling on the admissibility of evidence, such as that at issue in Vernes. Moreover, the Court proceeds directly from its discussion in ¶ 70 of the comparability of a scheduling order and an interrogatory-a matter I do not believe Texaco seriously disputes-to an analysis of whether Sunburst was prejudiced by the allegedly inadequate disclosures. In my view, the prejudice to Sunburst, or lack thereof, comes into play only if the Court first concludes the District Court did not abuse its discretion in determining that Texaco’s conduct warranted sanctions-or, in other words, that Texaco actually violated *313 the scheduling order or M. R. Civ. P. 26(b)(4)(A)(i). For these reasons, I cannot join the Court’s analysis of Issue 4.
¶172 Some background leading to the District Court’s rulings on this issue helps set the stage for what I believe is the appropriate analysis. This case commenced in the District Court in February of2001. Texaco removed the case to the United States District Court for the District of Montana, which remanded it in January of2002. The District Court entered a scheduling order on November 8, 2002. Later, upon the parties’ stipulation, the District Court vacated that scheduling order. The District Court entered a second scheduling order on October 21, 2003, which required, among other things, disclosure of experts by March 26, 2004.
¶173 On March 29, 2004, the parties filed a stipulation to resolve a discovery dispute. Among other things, the stipulation provided that the expert disclosure deadline would be extended to May 11,2004, only two and one-half months before the date set for trial. Sunburst timely filed its disclosure on that date. On May 13, 2004, Texaco filed a document entitled “Texaco’s Rule 26(b)(4)(A)(i) Disclosures.” That document lists 191 individuals, without clearly differentiating all expert witnesses from fact witnesses. It appears from the record that approximately 67 of these witnesses may have been expected to offer expert testimony.
¶174 On May 17, 2004, Sunburst moved to exclude Texaco’s expert witnesses pursuant to M. R. Civ. P. 16, 26 and 37. Texaco responded on June 4, 2004, and Sunburst replied on June 14. Texaco did not, at any point, attempt to supplement its disclosures, although it did move to amend its disclosures to add a previously unidentified expert. The District Court heard arguments on Sunburst’s sanction motion to exclude Texaco’s experts on July 26, 2004. Jury voir dire commenced on July 27.
¶175 At the July 26 hearing, Texaco conceded it had left certain ‘blanks” in the disclosures regarding some witnesses, and would not offer expert testimony from those individuals. Regarding other disclosures, Texaco asserted that references to DEQ reports in Sunburst’s possession set forth the witnesses’ opinions and grounds for those opinions. The District Court stated “[w]ell, you mean just to make reference to four file drawers of research that they’ve done? That’s not really good enough.” Analogizing Texaco’s report-referencing disclosures to requests for in camera inspection of voluminous documents, the court stated “those are non[-]disclosures because the devil is in the detail. I’m being inundated. And that’s the *314 problem. That’s the reason why I think you have to have specific disclosure, the opinion itself and the grounds or the methodology used to arrive at that opinion.” The court also stated its view that the purpose of requiring simultaneous disclosure of experts was to preclude one party from “springboard[ing]” its experts’ opinions off those of the opposing party’s experts. In addition, the court stated that if purported experts were “listed but there is absolutely no opinion, no grounds for an opinion, no methodology, they’re not going to testify.”
¶176 At trial, disputes arose regarding Texaco’s disclosure of individual witnesses. During Linda Barnes’ testimony in Texaco’s casein-chief, Sunburst objected to certain statements and questions on grounds of hearsay and inadequate disclosure of some documents. At a sidebar, the District Court inquired about Texaco’s disclosure of Barnes and ultimately ruled that she had not been adequately disclosed as an expert. In that regard, the District Court stated “I have in front of me 28 large loose leaf binders .... To say that the opinion is contained in those binders in my opinion is not adequate. That there is surprise. You could reach into those volumes and pull out anything.” The next day, Sunburst objected to a question based on the District Court’s ruling that Barnes had not been adequately disclosed as an expert, and Texaco’s counsel requested another sidebar. During that sidebar, Texaco’s counsel stated “I finally decided to get into the books a bit on this [Rule] 26(b)(4) issue,” and asserted-based on cases from other jurisdictions-that a party need not provide expert disclosures with respect to non-retained witnesses with expertise who have perceived or participated in the events about which they testify. The District Court did not reverse its ruling regarding Barnes, and it subsequently excluded Texaco’s proffered expert testimony from two other witnesses. Texaco submitted written offers of proof regarding those three witnesses, and also regarding three other witnesses who were DEQ employees excluded for reasons discussed in Issues 5 and 6.
¶177 We review a district court’s decision to impose sanctions for failure to comply with a M. R. Civ. P. 16 scheduling order for abuse of discretion, because the district court sits in the best position to evaluate whether one party has disregarded the rights of the opposing party and what, if any, sanction most appropriately addresses the violating party’s conduct. Germann v. Stephens, 2006 MT 130, ¶ 23, 332 Mont. 303, ¶ 23, 137 P.3d 545, ¶ 23 (citations omitted).
¶178 The pertinent part of the scheduling order at issue states:
*315 March 26.2004 [subsequently extended by stipulation to May 11]: The parties must disclose names and addresses of witnesses, including expert witnesses on or before this date. The expert witness disclosure shall include information required by Rule 26(b)(4)(A)(i), M.R.Civ.P. The purpose of this order is to achieve simultaneous disclosure of expert witnesses. No expert may be identified after this date except upon a showing of good cause.
M. R. Civ. P. 26(b)(4)(A)(i) states:
(4) Trial preparation: Experts. Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of subdivision (b)(1) of this rule and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows:
(A)(i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.
¶179 Texaco makes no argument and sets forth no case law regarding M. R. Civ. P. 16, with respect to whether its conduct met the requirements of the scheduling order. It mentions the scheduling order only to the extent that order references M. R. Civ. P. 26(b)(4)(A)(i). Texaco then immediately proceeds to a discussion of whether its disclosures comported with Rule 26(b)(4)(A)(i).
¶180 As stated above, the appellant bears the burden of establishing error. Marriage of McMahon, ¶ 7. Given Texaco’s total failure to address whether it complied with the non-Rule 26(b)(4)(A)(i)-related parts of the scheduling order, I would simply conclude that it has not established an abuse of discretion in the District Court’s decision that a sanction was appropriate. I have also carefully considered Texaco’s arguments and authorities regarding M. R. Civ. P. 26(b)(4)(A)(i) and, if it were necessary to reach them, I would conclude that Texaco has not, via those arguments and authorities, established an abuse of discretion in the District Court’s decision to impose a sanction on this record.
¶181 Texaco next asserts that the District Court was required to afford it a second chance-a step the court did not take-before imposing any sanction. In addition, Texaco contends telephone calls between counsel could have resolved this dispute. These arguments-in the context of this case and the record before us-are, in my view, specious.
*316 ¶182 In any event, Texaco’s reliance on Burlington Northern v. District Court, 239 Mont. 207, 779 P.2d 885 (1989), is misplaced. Texaco states that our intent regarding discovery sanctions, as stated in Burlington Northern, is that a party whose conduct may warrant sanctions gets “a second chance to comply with discovery requests before awarding sanctions.” See Burlington Northern, 239 Mont. at 218, 779 P.2d at 893. Texaco’s reading is far too broad.
¶183 What Texaco fails to acknowledge is our observation of the importance of distinguishing between the subsections of Rule 37, the rule setting forth discovery sanctions. As is clear in Burlington Northern, Rule 37(a) provides for a sanction of attorney fees and costs in certain specific circumstances. Burlington Northern, 239 Mont. at 218, 779 P.2d at 892-93. That subsection of M. R. Civ. P. 37 is not at issue here.
¶184 Texaco’s reliance on Burlington Northern for the necessity of a “second chance,” insofar as it relates to Rule 37(b), is correct as far as it goes. We stated without equivocation that “[u]nder section (b) no sanctions are available without a previous court order[.]” Burlington Northern, 239 Mont. at 219, 779 P.2d at 893. Here, however, the scheduling order is indisputably a court order, as contemplated in M. R. Civ. P. 37(b), and M. R. Civ. P. 16(f) clearly provides that a court may impose certain sanctions set forth in M. R. Civ. P. 37(b), including prohibiting the introduction of certain evidence, for violation of a scheduling order. Thus, Rule 37(b) applies in this case.
¶185 The other portion of Rule 37 addressed in Burlington Northern is the sanction available pursuant to M. R. Civ. P. 37(d) which may be imposed, without a “second chance,” for failure to attend one’s own deposition, serve answers to interrogatories, or respond to a request for inspection. See Burlington Northern, 239 Mont. at 218-19, 779 P.2d at 893. Because in this case, as stated by the Court in ¶ 70, the scheduling order is the functional equivalent of an interrogatory, Texaco’s violation of that order was also sanctionable without a “second chance” under M. R. Civ. P. 37(d). I conclude the District Court did not abuse its discretion in excluding Texaco’s experts without first affording a “second chance.”
¶186 Finally, Texaco contends that, in the event we affirm the District Court’s decision to impose a sanction, the exclusion of its expert witnesses was too harsh under the three-factor test for analyzing the harshness of discovery sanctions articulated in Henricksen v. State, 2004 MT 20, ¶ 58, 319 Mont. 307, ¶ 58, 84 P.3d 38, ¶ 58. Texaco cites to no authority for the proposition that this three- *317 factor test applies to scheduling order sanctions as well as to discovery-sanctions. However, because I agree with the Court’s reasoning in ¶ 70 that the scheduling order had the same effect as an interrogatory, I address Texaco’s “harshness” arguments under the three-factor discovery sanction test.
¶187 After briefing in this case ended, we decided Culbertson-Froid-Bainville Health Care Corp. v. JP Stevens & Co., 2005 MT 254, 329 Mont. 38, 122 P.3d 431. There, we reiterated our longstanding three-factor test for discovery sanctions as whether the sanction (1) relates to the extent and nature of the discovery abuse; (2) relates to the extent of the prejudice to the opposing party which resulted from the discovery abuse; and (3) is consistent with the consequences expressly warned of by the trial court, if such a warning was actually issued. Culbertson, ¶ 14 (citation omitted). We also clarified that the third prong of the “harshness” test does not require a trial court to issue a warning before imposing a discovery sanction. Culbertson, ¶ 15. In this respect, Texaco’s assertions regarding the District Court’s failure to issue a warning are without merit, because the District Court was not required to do so.
¶188 Regarding the other two factors, Texaco contends the exclusion of its experts is not proportional to the violation, because the District Court could have limited its expert testimony to the opinions expressed in a feasibility study and subsurface report filed with DEQ, and Texaco’s violation was neither a complete failure to disclose nor a contumacious action. Texaco further asserts Sunburst was not prejudiced because Sunburst deposed three experts and had opportunity to depose others, Sunburst’s experts referred to opinions set forth in the DEQ reports and did not assert difficulty in identifying those opinions, Sunburst did not complain of prejudice until the District Court suggested it, and Sunburst’s expert reports were longer than the DEQ reports.
¶189 In this respect, while I do not necessarily agree with the Court’s reliance in ¶ 72 on Jenkins-a case from another jurisdiction advanced by Texaco for a different proposition-I agree that Texaco’s arguments on appeal do not establish an abuse of discretion in the exclusion of its experts’ testimony based on the “harshness of discovery sanctions” test. Given the stipulated, later date for meeting the scheduling order requirements, the untimely and far from adequate disclosure by Texaco, the hearing on Sunburst’s motion only the day before trial, and Texaco’s counsel’s rather off-hand statement in the midst of tried that he had “finally decided to get into the books a bit” on *318 the discovery sanction issue, I would conclude Texaco has not established by its arguments that the sanction was too harsh under the circumstances of this case. For these reasons, I would decline to address the Montana cases and cases from other jurisdictions advanced by Texaco regarding overly harsh sanctions which generally concern a single violation in a simpler case involving far less delay and far fewer identified or potential experts than those involved here. ¶190 I conclude the District Court did not abuse its discretion by excluding Texaco’s expert testimony as a sanction.
DEQ Evidentiary Ruling in relation to substantive tort claims-Issue 5
¶191 Regarding Issue 5, while I agree with the result the Court reaches, I must respectfully dissent from its after-the-fact reasoning relating to the strict liability claim because the jury could not and did not answer a necessary causation question regarding strict liability on the special verdict form. The District Court having properly left the causation question to the jury, and the special verdict form having prevented the jury from answering it, Sunburst did not prevail on-or recover damages for-the strict liability claim. In addition, the Court’s after-the-fact analysis contradicts Sunburst’s theories of the case at trial, including arguments regarding Texaco’s alleged failure to respond appropriately in the years immediately preceding the trial and-as noted by the Court in ¶ 67-assertions that the plume was expanding at the time of trial, which Sunburst posited was due in part to sources at the refinery site other than the 1955 leak. The Court’s after-the-fact analysis also is contrary to the District Court’s reasoning in its order on the parties’ statute of limitations motions that the torts in this case were continuing. For these reasons, I cannot join the Court’s analysis.
¶192 Before turning to the record, I note Texaco frames its arguments regarding this issue in terms of the “trial on methods of remediation” and “the jury’s assessment of remedial measures’-indicating yet again its focus on the $15 million award for trespass and not any “individualized damages” awarded for the substantive torts, including the constitutional tort. In any event, Texaco makes no argument in this issue differentiating the constitutional tort claim from the other substantive tort claims. Below, my references to “substantive tort claims” do not include the constitutional tort claim, about which Texaco has made no specific argument.
*319 ¶193 Sunburst’s second motion in limine sought to prohibit Texaco from introducing evidence of or referring to the DEQ proposal or selection of a remediation method on grounds the evidence was irrelevant to the substantive tort claims for which it sought restoration costs, and would be prejudicial and confusing. In response, Texaco asserted the DEQ decisions were highly relevant because, among other things, its actions and the appropriate remediation method could not be understood except in the context of DEQ’s administrative oversight.
¶194 Addressing Sunburst’s motion at the pretrial hearing, the parties and the District Court discussed several matters, including whether the court or jury would be required to defer to DEQ’s decisions, whether Texaco had any duties relating to the substantive tort claims that were separate from DEQ’s requirements, and whether Texaco could introduce scientific evidence without mentioning DEQ. The District Court suggested that Texaco might attempt to “cloak” itself in the authority of DEQ, “[o]r taking it in a different direction, saying we’re blameless. We’re just doing what DEQ told us to do.” The court opined, in the latter regard, that “[i]t almost approaches the empty chair defense.”
¶195 Just before opening statements, the District Court orally granted Sunburst’s motion in limine, thereby prohibiting Texaco from introducing any evidence of DEQ’s involvement. After further argument, however, the court stated it was making “general statements” and had not heard the testimony. The court indicated it would allow Texaco to present evidence of the steps Texaco took, but not to say “we are just acting at the direction of DEQ.” After yet more argument, the District Court advised that if Texaco believed any evidence was “absolutely critical” at any point during the trial, the court would hear argument outside the presence of the jury.
¶ 196 Throughout the trial, the District Court held frequent sidebars to address Texaco’s assertions that, in examining various witnesses, Sunburst opened the door to certain testimony regarding DEQ’s involvement. The court repeatedly ruled that, while DEQ was not at issue in this case, Texaco could inquire regarding why certain actions were taken and could cross-examine about matters raised during Sunburst’s examination. Texaco attempted to do so, but the expert sanction discussed in Issue 4 often prevented Texaco from presenting expert testimony, and Texaco asserted difficulty in presenting other testimony regarding its conduct without referring to DEQ.
¶197 The District Court subsequently entered its written order, which stated “MDEQ’s opinion as to proper remediation under CECRA *320 does not address the extent of [the] damages claimed by the Plaintiffsf,]” and evidence of DEQ’s CECRA-related determinations and opinions would unnecessarily lengthen the trial and cause confusion. Regarding Texaco’s argument that DEQ’s opinions about remediation methods would guide the jury in determining the amount of restoration damages, the District Court also reasoned that Texaco had not properly disclosed any DEQ witness as an expert. In its later order denying Texaco’s motions for a new trial and for judgment as a matter of law, the District Court restated its reasoning that the DEQ evidence was irrelevant and confusing, Texaco had improperly sought to “cloak” itself in the authority of the State, and much of Texaco’s proffered DEQ evidence was inadequately disclosed expert evidence. On appeal, Texaco challenges this evidentiary ruling-under this issue-as it pertains to the substantive tort claims.
¶198 We review a trial court’s evidentiary ruling for abuse of discretion. Finstad, ¶ 43. A court abuses its discretion when it acts arbitrarily without employment of conscientious judgment or exceeds the bounds of reason. Murray v. Talmage, 2006 MT 340, ¶ 10, 335 Mont. 155, ¶ 10, 151 P.3d 49, ¶ 10 (citation omitted).
¶199 Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. M. R. Evid. 401. Evidence which is not relevant is not admissible. M. R. Evid. 402.
¶200 With respect to the District Court’s relevancy reasoning, Texaco contends the District Court abused its discretion in excluding the DEQ evidence as it pertained to the substantive tort claims, because the jury did not have “context” in which to place evidence regarding standards for contamination and risks resulting from violations of those standards. In this respect, Texaco asserts the District Court forced the jury to assume DEQ’s role in selecting remediation standards and remedies, yet denied the jury information that would have been most important to DEQ or to a court reviewing DEQ’s decisions. Texaco also asserts that the excluded evidence would have established that DEQ directed each step in the investigation and monitored the work of Texaco’s environmental contractors. Moreover, Texaco contends the District Comb’s ruling precluded it from presenting evidence that DEQ would do the monitoring under the MNA plan. On their face, these arguments have little to do with Sunburst’s substantive tort claims.
*321 ¶201 In addition, Texaco presents only scant-and general-authority regarding the District Court’s relevancy reasoning as it pertains to the substantive tort claims. It advances Schuff v. A.T. Klemens & Son, 2000 MT 357, ¶¶ 27, 81, 303 Mont. 274, ¶¶ 27, 81, 16 P.3d 1002, ¶¶ 27, 81, a case addressing a discovery sanction in which we reviewed whether the trial court, in view of all the circumstances, ignored recognized principles, including the principle of trial on the merits, resulting in substantial injustice. It also advances Montana Fair Housing, Inc. v. Barnes, 2002 MT 353, ¶ 12, 313 Mont. 409, ¶ 12, 61 P.3d 170, ¶ 12, in which we stated that a ruling based on an inaccurate view of the law or clear error of fact-there, the denial of attorney’s fees-is an abuse of discretion. Texaco advances no other authority regarding relevancy under this issue. In my view, these few and readily distinguishable cases provide no assistance to Texaco in meeting its burden of establishing an abuse of discretion with respect to the District Court’s evidentiary ruling based on relevancy considerations.
¶202 In any event, I am unwilling to conclude that evidence is relevant simply because the offering party has characterized it as providing “context.” Nor do I believe Texaco has established that regulatory compliance evidence regarding CECRA standards and DEQ’s involvement would make more or less probable any fact of consequence pertaining to Sunburst’s substantive tort claims.
¶203 I conclude Texaco has failed to establish that the District Court abused its discretion by excluding the DEQ evidence as irrelevant to Sunburst’s substantive tort claims. As a result, it is unnecessary to address the other bases on which the District Court excluded that evidence, and Texaco’s related arguments, in this issue.
Punitive Damages-Issue 6
¶204 I concur in the Court’s conclusion that the District Court abused its discretion by excluding Texaco’s DEQ-related evidence at trial for the jury’s consideration in relation to the question of Texaco’s liability for punitive damages and join the Court in reversing and remanding on that basis. As discussed more thoroughly below, however, it is my view that this conclusion can — and should-be reached under Montana law, as opposed to the cases from other jurisdictions upon which the Court relies.
¶205 In ¶ 81, the Court advances Silkwood for the proposition that a good-faith effort to comply with government regulations “would be” evidence of conduct inconsistent with the mental state requisite for punitive damages. The Silkwood case, as cited, was a federal district *322 court’s post-trial order and opinion, an order and opinion that ultimately led to a series of appellate decisions. See Silkwood v. Kerr-McGee Corp., 667 F.2d 908 (10th Cir. 1981); Silkwood v. Kerr-McGee, Corp., 464 U.S. 238, 104 S.Ct. 615 (1984) (superseded by statute); Silkwood v. Kerr-McGee, Corp., 769 F.2d 1451 (10th Cir. 1985). The federal district court made the “good-faith” statement in rejecting the defendant’s argument that it was entitled to a jury instruction that a defendant’s substantial compliance with atomic energy regulations barred punitive damages. Silkwood, 485 F. Supp., at 577-85. The court reasoned that the defendant had ample opportunity to present evidence of its compliance-apparently, absent any objection by the plaintiff-and the jury determined its conduct warranted punitive damages based on the evidence presented at trial. Silkwood, 485 F. Supp. at 584. Here, of course, the very issue before us is whether the District Court abused its discretion in excluding DEQ-related evidence from the jury’s consideration of Texaco’s liability for punitive damages. In my view, Silkwood provides little assistance on that issue.
¶206 Nor would I rely on EEOC or Swinton, which are both federal employment discrimination cases. Among other things, those cases provide that (1) to be liable for punitive damages, an employer must not only discriminate, but know the discrimination may violate federal law; and (2) an employer may assert “good faith” as a defense to allegations of vicarious liability for managers’ discriminatory actions. See Swinton, 270 F.3d at 809-10 (citing Kolstad v. American Dental Ass’n, 527 U.S. 526, 536, 545, 119 S.Ct. 2118, 2125, 2129). Those legal considerations are not at issue here and, as a result, I would not rely on such unrelated cases. Moreover, I observe that, contrary to the Court’s citation to Swinton in ¶ 84 for the proposition that a court “may not categorically exclude” evidence regarding a defendant’s reasons for acting or not acting, the Ninth Circuit actually “decline[d] to endorse” a bright-line rule that post-occurrence remedial evidence is either always relevant or always irrelevant, and characterized the admissibility of such evidence as within a trial court’s discretion. Swinton, 270 F.3d at 814-17. Swinton has no application here.
¶207 As stated above, relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. See M. R. Evid. 401. In past cases, this Court has often set forth the language of M. R. Evid. 401 and-without advancing any authority regarding the relevancy of a specific category of evidence-concluded that the evidence at issue either was or was not *323 relevant. See, e.g., State v. Cesnik, 2005 MT 257, ¶ 16, 329 Mont. 63, ¶ 16, 122 P.3d 456, ¶ 16; Wiman v. Dept. of Labor and Industry, 2004 MT 208, ¶¶ 32-33, 322 Mont. 332, ¶¶ 32-33, 96 P.3d 710, ¶¶ 32-33; Christofferson v. City of Great Falls, 2003 MT 189, ¶ 34, 316 Mont. 469, ¶ 34, 74 P.3d 1021, ¶ 34. These cases illustrate that relevancy generally is a fact- and record-specific question that requires a court to consider-under the circumstances of a given case-whether a fact is “of consequence,” and whether the evidence tends to make the existence of that fact more or less probable. While cases concerning similar types of evidence may be helpful in our analysis of relevancy, especially when we have the benefit of parties’ arguments on whether the cases are analogous or distinguishable, our prior cases are clear that such authorities are not always necessary.
¶208 Before addressing the District Court’s evidentiary ruling, I note Texaco’s assertion of entitlement, based on regulatory compliance, to judgment as a matter of law with respect to the punitive damages claim. Texaco’s position is primarily based on United States Supreme Court cases addressing the federal Due Process Clause in relation to awards based on nationwide or out-of-state conduct affecting non-parties, and appellate decisions-including one Montana case-in which reviewing courts have determined a punitive damages jury instruction was not warranted based on a record including evidence of a defendant’s regulatory compliance. See, e.g., State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 420-21, 123 S.Ct. 1513, 1521-22 (2003); Ferguson v. Town Pump, Inc., 177 Mont. 122, 132-33, 580 P.2d 915, 921 (1978), overruled on other grounds by Bohrer v. Clark, 180 Mont. 233, 240, 590 P.2d 117, 121 (1978); Harrison v. Indiana Auto Shredders Co., 528 F.2d 1107, 1125-26 (7th Cir. 1976). These cases are not persuasive.
¶209 In a reply brief footnote, Texaco provides only a citation and parenthetical summary of Alcorn v. Union Pacific R.R. Co., 50 S.W.3d 226, 247-49 (Mo. 2001), which apparently applies an automatic preclusion of punitive damages based on a defendant’s regulatory compliance-although that case also has language regarding “factors” to be considered in determining whether punitive damages are precluded as a matter of law. Without more extensive argument, I am unconvinced that Montana should or would follow Alcorn’s reasoning. Thus, I conclude Texaco has not established error in the District Court’s failure to enter judgment as a matter of law in its favor regarding the punitive damages claim.
*324 ¶210 Turning now to the District Court’s evidentiary ruling as it pertains to punitive damages, the District Court reasoned that the DEQ evidence was not admissible because it was irrelevant, confusing, and a “cloak,” or a means for Texaco to posit “we did it at the direction of DEQ.” The District Court also determined that much of the DEQ evidence was expert testimony that had been excluded as a sanction for inadequate disclosure. I address these reasons in turn, relying on Montana law.
¶211 Again, as stated above, M. R. Evid. 401 defines relevant evidence as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Our cases further provide that evidence is relevant if it will have any value, as determined by logic and experience, in proving the proposition for which it was offered. See State v. Hamilton, 2002 MT 263, ¶ 20, 312 Mont. 249, ¶ 20, 59 P.3d 387, ¶ 20 (citation omitted); Werre v. David, 275 Mont. 376, 389, 913 P.2d 625 633 (1996) (citation omitted).
¶212 Subject to certain statutory provisions, reasonable punitive damages may be awarded when the defendant has been found guilty of actual fraud or actual malice. Section 27-1-221(1), MCA. A defendant is guilty of actual malice if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the plaintiff, and deliberately proceeds to act in conscious or intentional disregard of, or with indifference to, the high probability of injury to the plaintiff. Section 27-1-221(2), MCA. A defendant is guilty of actual fraud if the defendant makes a representation with knowledge of its falsity, or conceals a material fact with the purpose of depriving the plaintiff of property or legal rights or otherwise causing injury. Section 27-1-221(3), MCA.
¶213 The District Court instructed the jury in accordance with §§ 27-1-221(2) and (3), MCA, with regard to definitions of fraud and malice for purposes of punitive damages, including language about a defendant acting intentionally, knowingly or purposefully in causing damage to the plaintiff. On the special verdict form, the jury answered “yes” to question 13, which reads “[w]ere the Defendants guilty of actual malice and/or actual fraud, as defined by the Court’s instructions, with respect to their conduct in Sunburst so as to impose punitive damages?”
¶214 Since Texaco was not permitted to introduce the DEQ evidence in relation to its liability for punitive damages, the issue is whether that evidence meets the standard in M. R. Evid. 401 of “having any *325 tendency to make the existence of any fact ... of consequence” — here, Texaco’s state of mind-“more probable or less probable.” In my view, the only reasonable answer is that the DEQ evidence was, indeed, very relevant. Based on the DEQ evidence, a jury could have determined that Texaco did not act intentionally, knowingly, or purposefully in causing injury to Sunburst, because it acted with the belief that its compliance with DEQ was sufficient. See §§ 27-1-221(2) and (3), MCA. Conversely, of course, Texaco would not necessarily have prevailed based on this evidence. Despite its lack of probative value in relation to the substantive tort claims, the DEQ evidence clearly had probative value with respect to the questions of liability for actual fraud and actual malice. See Hamilton, ¶ 20. Thus, I conclude the District Court abused its discretion in excluding the DEQ evidence on relevancy grounds.
¶215 Regarding the District Court’s reasoning that the DEQ evidence was confusing, M. R. Evid. 403 states that, although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Texaco advances Phillip R. Morrow v. FBS Ins., 236 Mont. 394, 400, 770 P.2d 859, 862 (1989), for the proposition that a trial court may exclude evidence as confusing under M. R. Evid. 403 only if “ ‘the evidential material was necessarily and thoroughly objectionable or else was of minor utility and could be easily sacrificed ... nor should the exclusion be an absolute one, unless a conditional or temporary exclusion would not suffice for the purpose.’ ” Applying Phillip R. Morrow, it is my view that the DEQ evidence was not of minor utility when Texaco’s state of mind was the only issue relating to its liability for punitive damages. Nor am I persuaded that the evidence was necessarily and thoroughly objectionable, such that the parties or the District Court could not have devised any means of admitting the evidence solely for one purpose without confusing the jury. I conclude the District Court abused its discretion in excluding all DEQ evidence on grounds that it was confusing.
¶216 The District Court also determined, as set forth above, that the DEQ evidence would allow Texaco to “cloak” itself in the authority of DEQ, or assert “we’re blameless. We’re just doing what DEQ told us to do.” Having concluded in Issue 5 that the DEQ evidence was irrelevant to the substantive tort claims, I agree with the District Court’s statement that Texaco could not seek to avoid liability, or don a *326 “cloak,” for those claims based on evidence of its compliance with DEQ. As set forth above, however, the DEQ evidence was relevant to the question of Texaco’s liability for punitive damages with respect to whether it acted with actual malice or actual fraud. It is axiomatic that a defendant may assert-indeed, must be allowed to present-a defense based on relevant and otherwise admissible evidence. Thus, I conclude the District Court abused its discretion in excluding the DEQ evidence as it pertained to punitive damages liability upon reasoning that such evidence was a “cloak,” or an improper attempt to shift blame.
¶217 Regarding the District Court’s reasoning that “much” of the DEQ evidence was inadequately disclosed expert evidence excluded under the sanction, Texaco asserts that even if “much” of its proffered DEQ evidence was expert evidence, at least some of it was not. I agree that, at the very least, Texaco should have been allowed to present fact testimony that DEQ was supervising Texaco’s activities. In my view, non-expert DEQ evidence is relevant and otherwise admissible with respect to the issue of whether Texaco acted with actual fraud or malice. Thus, I conclude the District Court abused its discretion via its blanket exclusion of all DEQ evidence based on its determination that “much” of that evidence was excluded expert evidence. As for the rest, only the parties and the District Court can sort these matters out on remand.
¶218 Having concluded, like the Court, that the District Court abused its discretion in excluding all of the DEQ evidence as it pertained to Texaco’s liability for punitive damages and that a remand is necessary, several other arguments raised by Texaco need not be addressed. Notwithstanding, I believe one final legal question related to punitive damages requires resolution prior to remand.
¶219 Texaco contends the District Court erred in failing to apply a 2003 statutory cap on punitive damages to reduce the $25 million award in this case because, while Sunburst filed suit in 2001, the jury rendered its verdict in 2004. Since 2003, § 27-1-220(3), MCA, has provided that a punitive damages award may not exceed $10 million or 3% of the defendant’s net worth, whichever is less. Texaco asserts that, pursuant to the statute, punitive damages in this case cannot exceed $10 million.
¶220 The District Court concluded that § 27-1-220(3), MCA, enacted in 2003, did not apply retroactively to this case. Relying on Dvorak v. Huntley Project Irr. Dist., 196 Mont. 167, 639 P.2d 62 (1981), the District Court determined that the statutory limit on punitive damages *327 affected a substantive right and, therefore, § 27-1-220(3), MCA, could not be applied retroactively absent express legislative intent.
¶221 After briefing in this case, we decided Seltzer v. Morton, 2007 MT 62, 336 Mont. 225, 154 P.3d 561. There, we cited to Dvorak in concluding that § 27-1-220(3), MCA, did not apply to a cause of action that accrued before the statute’s effective date of October 1, 2003. Seltzer, ¶¶ 121-26.
¶222 Seltzer and Dvorak control here. I conclude the District Court did not err in failing to apply the $10 million cap set forth in § 27-1-220(3), MCA.
¶223 I concur with the Court’s reversal of the punitive damages award on the basis that the District Court abused its discretion in excluding the DEQ evidence as it pertained to Texaco’s liability for punitive damages, and in the Court’s remand.
Issue 7-Attomey fees
¶224 Regarding attorney fees, I again join the result the Court reaches, but would employ a different analysis. First, I would address Texaco’s threshold argument that Sunburst’s motion for attorney fees was deemed denied because the District Court lacked jurisdiction when it entered its attorney fee order four days after the 60-day time limit set forth in M. R. Civ. P. 59(g). See Associated Press v. Crofts, 2004 MT 120, ¶¶ 35-37, 321 Mont. 193, ¶¶ 35-37, 89 P.3d 971, ¶¶ 35-37.
¶225 A motion for attorney fees filed after entry of judgment is treated as a motion to alter or amend a judgment. Associated Press, ¶ 36 (citation omitted). Amotion to alter or amend the judgment shall be served not later than 10 days after the service of the notice of the entry of the judgment; if the trial court does not rule on the motion within 60 days from the time the motion is filed, the motion is deemed denied. M. R. Civ. P. 59(g). The 60-day limit is a mandatory jurisdictional time limitation to which this Court strictly adheres. Associated Press, ¶ 37 (citation omitted).
¶226 Sunburst moved for attorney fees on August 25, 2004. Sixty days after that was October 24, which fell on a Sunday, so the District Court had until October 25 to enter its order. See M. R. Civ. P. 59(g). The District Court entered its order awarding attorney fees on October 29, 2004. Thus, pursuant to M. R. Civ. P. 59(g) and Associated Press, the District Court lacked jurisdiction to enter the order at that point, and Sunburst’s motion for attorney fees was deemed denied.
¶227 Sunburst’s only assertion regarding the District Court’s jurisdiction is that Texaco’s argument is “largely moot” because the *328 substantive attorney fees issue has been presented to the Court. I am unwilling to conclude a jurisdictional issue is moot absent authority to that effect. Moreover, the issue is not moot because whether Sunburst’s motion was granted or deemed denied determines which party carries the burden of establishing an abuse of discretion on appeal. If deemed denied, Sunburst must establish an abuse of discretion; if granted, Texaco bears the burden.
¶228 Having concluded the District Court lacked jurisdiction when it entered the order granting attorney fees, the question remains whether Sunburst has established an abuse of discretion in the deemed denial of its motion for attorney fees under the private attorney general doctrine. In ¶ 91, the Court apparently determines, pursuant to Flannery-a case not cited by either party-that the size of the judgment, standing alone, entirely disposes of the question. Flannery addressed a California statute regarding the private attorney general doctrine that differs in certain respects from our MonTrust three-factor test. See Flannery, 61 Cal. App. 4th at 634, 71 Cal. Rptr. 2d at 635.
¶229 It is my view that Montana law, particularly MonTrust’s three-factor test, provides ample authority regarding the private attorney general doctrine, an equitable exception to the American Rule. As noted by the Court in ¶ 89, the MonTrust “private attorney general” factors are: (1) the strength or societal importance of the public policy vindicated by the litigation; (2) the necessity for private enforcement and the magnitude of the resultant burden on the plaintiff; and (3) the number of people standing to benefit from the litigation. MonTrust, ¶ 66.
¶230 With respect to the first two factors, Sunburst asserts it has vindicated the right to a clean and healthful environment, it was necessary to bring this private litigation because DEQ was not doing enough to clean the properties, and Sunburst’s counsel logged thousands of hours working on this case. Regarding the third factor, Sunburst asserts its litigation has benefited all present and future Sunburst residents, as well as all Montana citizens interested in a clean environment. In this respect, Sunburst cites to MonTrust, ¶ 67, in which the Court determined the litigation at issue there benefited a “large class” defined as “all Montana citizens interested in Montana’s public schools.”
¶231 Under either the Court’s analysis or mine in Issue 3-neither of which addresses whether Article II, § 3 is self-executing or otherwise may be the basis of an independent cause of action-Sunburst’s *329 litigation has not “vindicated” a constitutional right in any manner that would benefit future litigants. Moreover, the private attorney general doctrine is primarily used when the government fails to properly enforce interests significant to its citizens. Finke, ¶ 31 (citation omitted). Given Sunburst’s repeated assertions that DEQ is not at issue here and the corollary reality that Sunburst has not established such a governmental failure, Sunburst’s “necessity” argument vis-á-vis DEQ’s “not doing enough” rings somewhat hollow. Similarly, that Sunburst’s counsel no doubt spent considerable time on the case is not surprising, but also does not-given various fee arrangements-necessarily result in a significant burden on the plaintiffs here. With respect to the third MonTrust factor-regarding the number of people standing to benefit-the record reflects that several Sunburst residents declined to join or “dropped out” of this lawsuit. Finally, insofar as Sunburst’s assertions regarding “interested” Montana citizens pertains to the physical cleanup of Sunburst properties-as opposed to a “vindicated right” not established here-I interpret the third MonTrust factor to require more than an assertion that the litigation benefits those Montanans interested in a clean and healthful environment. While those Montanans may have a passing concern regarding a community where they do not reside or have any other established interest, such a concern is, in my view, a far cry from the self-evident interest in Montana public schools identified in MonTrust.
¶232 I conclude Sunburst has not established an abuse of discretion in the deemed denial of its motion for attorney fees. Thus, I concur with the Court in its conclusion in Issue 7 that Sunburst is not entitled to attorney fees.
¶233 In Siam, I concur with the results reached by the Court on all issues, for the reasons set forth above, with the caveat that I concur with the results of Issues 2 and 3 only insofar as they result in affirming the restoration costs award.